**DISTRICT OF COLUMBIA, Appellant,**

v.

**John Chester BRADY, Appellee.**

**No. 14940.**

United States Court of Appeals
District of Columbia Circuit.

Argued May 24, 1960.

Decided June 30, 1960.

Prettyman, Chief Judge, and Edgerton, Bazelon and Fahy, Circuit Judges, dissented in part.

Mr. Henry E. Wixon, Asst. Corp. Counsel for District of Columbia, with whom Mr. Chester H. Gray, Corp. Counsel, Mr. Milton D. Korman, Principal Asst. Corp. Counsel, and Mr. Leo J. Ehrig, Jr., Asst. Corp. Counsel, were on the brief, for appellant.

Mr. David L. Riordan, Washington, D. C., for appellee.

Before PRETTYMAN, Chief Judge, and EDGERTON, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges.

BASTIAN, Circuit Judge, with whom WILBUR K. MILLER, WASHINGTON, DANAHER and BURGER, Circuit Judges, join.

This is an appeal from a judgment of the District Court in favor of Dr. John Chester Brady, appellee, against the District of Columbia. The judgment was for recovery of all amounts paid by Dr. Brady to the District as unincorporated business franchise taxes for the years 1952 through 1956.

Appellee has practiced medicine in the District of Columbia for nearly half a century. For nearly half a century he has followed the practice of investing his money in first trust notes as security. "95 per cent" of all these transactions originated with a certain real estate agency known as Sullivan Bros. In both his medical practice and his investment program he has been successful. At the beginning of the period in question, he held over 100 notes, representing loans in excess of $750,000.00.

During 1952–1956, thirty-six loans were made, renewed or refinanced. Of these, nineteen (over one-half) were renewal or refinancing transactions. [Plaintiff's Exhibit 5.] In 1955 and 1956 there were sixteen transactions involving notes of $164,700.00, seven of these (nearly one-half) being note renewals or refinancing transactions, not new loans, for $95,700.00 (over one-half). During the same five-year period, appellee also owned and rented several properties. He testified that over all the years that he invested his money—either in real estate notes or in real estate— he had engaged the same agency, Sullivan Bros., for the purpose of investing his money in first trust notes, and of renting and handling his real property. For its services rendered in connection with the real estate owned by him, that firm received the usual real estate brokerage commission on rent collections. That firm received no remuneration from him for its services in connection with his investments in first trust notes. At no time did he have a financial interest in the firm.

During the taxable years here involved, Dr. Brady paid all unincorporated business franchise taxes assessed by the District of Columbia.[1]  These assess-

1. The assessments were levied under Title VIII of the District of Columbia Income and Franchise Tax Act of 1947, 61 Stat. 345, ch. 258 (§ 47–1574, D.C.Code, 1951).

ments were made by the District in the amounts declared by appellee in his franchise tax returns. Each of the payments was by a personal check marked "Paid Under Protest." Thereafter, Dr. Brady filed a claim for refund with the Assessor for the District of Columbia. Prior to any disposition of this claim, he brought suit in the District Court for recovery of the same taxes. His suit was premised on (a) the alleged involuntary payment of the taxes in question, and (b) his claim that he was never engaged in the "business" of lending money or the "business" of renting real estate. Judgment was entered in his favor for the full amount claimed. This appeal followed.

## I. The Alleged Need To Exhaust Administrative Remedies.

██ The District of Columbia urges that the taxpayer has failed to exhaust his administrative remedy. Of course it is a "long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." [2] But

if the administrative remedy is an alternative remedy it is not "prescribed" within the meaning of that rule and need not be followed. Common-law remedies survive unless the administrative remedy is *prescribed,* i. e., required.[3] The D.C. Code merely provides such a remedy; it does not prescribe it. Before statutes provided recourse to administrative boards, actions in the nature of *assumpsit* for money had and received were available for recovery of taxes.[4] Clearly Congress can proscribe a common-law right of action; and, conversely, it can prescribe an exclusive administrative remedy. But the D.C.Code does neither; it carefully spells out that the administrative remedy which it provides "shall not be deemed to take away from the taxpayer any remedy which he might have under any other provision of law." [5] Thus the taxpayer is now permitted recourse to either an administrative remedy or a common-law suit for recovery of District of Columbia taxes.

Moreover, under the Code, the ultimate exhaustion of the administrative remedy, i. e., a decision by the Tax Court, an

In pertinent part, the Act reads as follows:

"Sec. 1. *Definition of Unincorporated Business.* For the purposes of this article (not alone of this title) and unless otherwise required by the context, the words 'unincorporated business' mean any trade or business, conducted or engaged in by any individual, whether resident or nonresident, statutory or common-law trust, estate, partnership, or limited or special partnership, society, association * * * or by any other entity or fiduciary, other than a trade or business conducted or engaged in by any corporation; and include any trade or business which if conducted or engaged in by a corporation would be taxable under title VII of this article. * * *

\* \* \* \* \*

"Sec. 3. *Imposition and Rate of Tax.* For the privilege of carrying on or engaging in any trade or business within the District and of receiving income from sources within the District, there is hereby levied for each taxable year a tax at the rate of 5 per centum upon the taxable income of every unincorporated business, whether domestic or foreign. * * "

2. Myers v. Bethlehem Shipbuilding Corp., 1938, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638.

3. Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 436–437, 27 S.Ct. 350, 354, 51 L.Ed. 553: "* * * we concede that we must be guided by the principle that repeals by implication are not favored, and indeed that a statute will not be construed as taking away a common law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the preexisting right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory."

4. Maryland & Virginia Milk Products Ass'n v. Hazen, 66 App.D.C. 136, 138, 85 F.2d 302, 304, certiorari denied, 1936, 299 U.S. 566, 57 S.Ct. 29, 81 L.Ed. 417. See 51 Am.Jur. Taxation § 1167 n. 6, and cases collected therein; and see 3 Cooley, Taxation § 1300 (4th ed. 1924).

5. D.C.Code, § 47–1593a (1951 ed.), 61 Stat. 359 (1947).

"independent agency" in the District Government,[6] or indeed even the filing of an appeal with that Court, precludes the taxpayer from filing suit under his common-law remedy.[7] If the exhaustion of the administrative remedy is a bar to a common-law action, *a fortiori* it can in no sense be a condition precedent to such a suit.

We conclude that Dr. Brady's failure to exhaust his administrative remedy did not preclude his bringing action in the District Court.

■ It is settled that to establish the right to his remedy at law, *assumpsit* for money had and received, a taxpayer has only to pay the tax involuntarily. Neither the denial of a claim for refund nor even the filing of such a claim is a prerequisite to his suit.[8]

## II. The Alleged Voluntary Tax-Payment.

■■ The threshold question in such a common-law action is whether the original payment was voluntarily made. It is a general rule that anyone who freely, willingly, and knowingly (i. e., voluntarily) gives something to another loses all title to it. It is well settled in the District of Columbia that a tax payment voluntarily made cannot be recovered.[9] However there has been considerable dispute as to when a payment is "involuntary".

■ Not every payment of money "under protest" is an involuntary payment which will support a suit for re-covery of the amount paid.[10] Nor does the mere presence of a law providing for summary distraint of property belonging to tax delinquents convert every tax payment into an "involuntary" one. And clearly the fact that interest will or may accrue, or even has accrued, does not constitute legal duress.[11] However, when we were confronted in an earlier case [12] with a combination of these several factors, we found the payment "involuntary". In that case certain trust companies, faced with the prospect of monthly tax penalties, adverse publicity as tax delinquents, and summary distraint of their properties, paid, under protest, the gross earnings tax assessed by the District of Columbia. We held that the payments were involuntary and supported a common-law action for recovery. In the instant case we are concerned with a tax payment, made at a time when some interest had already accrued, by a taxpayer who testified that at the time he paid the tax he knew that non-payment would bring tax penalties and that his bank account could be attached, his property taken, and a criminal action begun against him. We think a payment under these circumstances was manifestly involuntary. We so hold.

## III. Alleged "Business".

The disputed taxes were levied on the theory that during the period involved Dr. Brady had been engaged in certain unincorporated businesses within the meaning of the District of Columbia Revenue Act. The District contended in the trial court that Dr. Brady had been en-

6. 66 Stat. 547 (1952), as amended, D.C. Code, § 47–2402 (Supp. VII, 1959).

7. Supra note 5.

8. State Tonnage Tax Cases, 1870, 12 Wall. 204, 79 U.S. 204, 209, 20 L.Ed. 370, 376; Maryland & Virginia Milk Products Ass'n v. Hazen, supra note 4; and see Keigwin, Cases in Common Law Pleading 219–221 (2d ed. 1934). By statute both federal and state taxing authorities have frequently annexed such conditions precedent to the common-law right of *assumpsit* for recovery of taxes. 27 Am.Jur. Income Taxes § 240; Annotation, 34 A. L.R. 979.

9. Panitz v. District of Columbia, 1940, 72 App.D.C. 131, 112 F.2d 39; and see D.C. Code § 47–2406 (1951 ed.), 52 Stat. 374 (1938).

10. Railroad Co. v. Commissioners, 1878, 98 U.S. 541, 544, 25 L.Ed. 196.

11. Putnam Tool Co. v. United States, 147 F.Supp. 746, 137 Ct.Cl. 183, certiorari denied 1957, 355 U.S. 825, 78 S.Ct. 33, 2 L.Ed.2d 39.

12. District of Columbia v. American Security & Trust Co., 1953, 92 U.S.App. D.C. 33, 202 F.2d 21.

gaged in the "business of lending money" and in the "business of renting real estate". The trial court held that the appellee was not engaged in the businesses of buying and selling real estate, of buying and selling notes, or of buying and selling stocks, within the meaning of the statute.

The Code defines "unincorporated business" as "any trade or business, conducted or engaged in by any individual" [13] and defines "trade or business" as including "the engaging in or carrying on of any trade, business, profession, vocation or calling or commercial activity in the District of Columbia".[14]

(a) *The Alleged Business of Lending Money.*

■ We turn, then, to the question as to whether appellee was engaged in the "business of lending money." The trial court, after the conclusion of the evidence in the case, made the following ruling:

"I find that Dr. John Chester Brady has been a physician practicing medicine in the District of Columbia since 1915; that he has practiced constantly since that time; that beginning very shortly after he started practice, and when he had money to invest, that he has invested money in first trust real estate notes, in certain real properties, and more latterly in a few stocks, common and preferred; that his purpose in so investing was to get income on the money that he had to invest, and that he is not engaged in the business of buying and selling real estate, he is not engaged in the business of buying and selling notes, and he is not engaged in the business of buying and selling stocks; that he has had a real estate agency handle the rental of such real estate as he owned, in the usual and customary way of one owning real estate who wishes to rent it and get an income therefrom normally does,

and that firm is Sullivan Brothers. I therefore conclude as a matter of law that Dr. Brady is not engaged in the business in the District of Columbia within the meaning of the Income and Franchise Tax Law of the District of Columbia."

We think these findings of facts and conclusions of law are correct and should be affirmed. The record clearly discloses that insofar as his investment in first trust notes is concerned, appellee was not in a business but was investing his excess money, as do many others.

The record discloses that, as a young doctor, he was taken by his father to the then president of the American Security and Trust Company and was advised to invest his earnings in first trust notes and real estate. This he has continuously done over a period of nearly fifty years, and with fruitful results. His investments were in first trust real estate notes secured on properties in the District of Columbia. He never sold the notes in which he invested but, as they were paid off, he reinvested the money in similar securities. Often when loans became due or were paid off in part they were renewed or refinanced. As above stated, in 1955 and 1956 the refinancing exceeded new loans. He never invested in second trust notes. His financial advisers were the real estate firm, Sullivan Brothers, in which he had confidence. That firm had applications for loans which were or were to be secured on private residential properties and, if a loan was to be made, they would ascertain from appellee whether he had money available for the investment. Sometimes he looked at the properties and sometimes he simply took the opinion of Sullivan Brothers as to the value. Sometimes he declined to make the particular investment, either because he did not like the loan submitted or because he did not have funds available for it. When he was approached for a loan, he would look at the property "once in a while. Very, very

13. § 47–1574, D.C.Code (1951), 61 Stat. 345 (1947).

14. § 47–1551c(h), D.C.Code (1951), 61 Stat. 332 (1947).

seldom." Usually, he simply depended on Sullivan Brothers, both as to the security of the loan and as to the integrity of the maker of the loan. He took, through Sullivan Brothers, "90 per cent, I would say; even more than that, 95 per cent" of the loans. One or two loans came from other real estate firms but these "didn't amount to anything." He never did business with any individual.

When the investments were made, the notes were placed by appellee in the American Security and Trust Company for collection, and periodic statements were rendered to him by that bank showing the status of the note payments, as he never personally handled his note collections and never dealt directly with the individual contracting the loan. If notes became overdue, they were handled by Sullivan Brothers.

Appellee, like many others, in an effort to diversify his investments in recent years, has also bought stock; and this, too, he holds for investment purposes only, never having sold any of the stock which he has purchased.

Appellee has neither office nor employees having anything to do with his investing in notes. He has an office for the practice of his medical profession, a secretary, a technician and two medical associates. None of these persons has anything whatsoever to do with his investments, and he has no employees who "handle anything in my real estate or stock or my notes." He has no office outside of his office as a physician.

It is hard to see anything in the wording of the statute quoted, or our decisions thereunder, which would justify the conclusion that appellee is engaged in any business. Certainly the language in Stone v. District of Columbia, 1952, 91 U.S.App.D.C. 140, 198 F.2d 601, points to the contrary. The court there pointed out that whether or not a particular course of conduct constitutes engaging in business necessarily depends upon the facts involved. "Business" we defined in that case as that which occupies the time, attention, and labor of men for the purpose of a livelihood or profit, and it was pointed out that investment in securities differs from "business" in that funds so invested are used by others, with compensation of the investor dependent upon the results obtained and dividends or interest paid. Certainly here, appellee simply invested funds for the purposes of income. Whether appellee purchased notes already made or whether he made loans through the real estate agent, he certainly was not in any business. He was simply making investments for his future security, on the income from which he regularly paid income tax, both Federal and District of Columbia; and it is unfair that he should be held to be engaging in business simply because he was in the fortunate position of having more of this world's goods than he needed for his livelihood and so put that money to work.

Notwithstanding the language of Stone, the District of Columbia relies strongly on that case, stating that there the court held that the taxpayer was found to be engaged in business within the meaning of the statute. That is perfectly correct, but the court was applying the rule which was laid down in that case to the facts in that case. The following facts were found in Stone:

"During the two years in question here, and for a number of years prior thereto, petitioner devoted his energies and funds to the purchase of second-trust notes at a discount. He was known in real estate circles as a source of second-trust money, and opportunities for the purchase of notes were brought to his attention by various persons. When approached for the purchase of a note, petitioner would investigate the credit of the maker and he would inspect the security to ascertain that the value justified the loan. If the credit risk and security were satisfactory to the petitioner, and if the price of the note was attractive, the transaction was completed. Thereafter, petitioner made his own collections, maintained records of payments, and followed up delinquent

debtors by telephone or letter. During the years with which we are concerned, petitioner devoted his full time to these activities, and aside from relatively small amounts from dividends and insurance commissions he had no income other than interest realized on the notes which he had purchased." 91 U.S.App. D.C. at page 142, 198 F.2d at page 603.

Practically none of the elements there set forth are present in the instant case. The facts demonstrate that appellee in this case did not "devote his energies and funds to the purchase of [notes] at a discount." There is no showing whatsoever that "he was known in real estate circles as a source of [trust] money, and opportunities for the purchase of notes were brought to his attention by various persons."

The testimony is quite to the contrary. He was known to practically only Sullivan Brothers, who were his advisers. See facts stated above. Nor does the record in this case show that, when "approached for the purchase of a note," he "would investigate the credit of the maker and he would inspect the security to ascertain that the value justified the loan." It is not a fact here that "if the credit risk and security were satisfactory to the petitioner, and if the price of the note was attractive, the transaction was completed." Here appellee relied on Sullivan Brothers for both the security risk and the integrity of the maker of the loan; also, there is no showing that there ever was an "attractive price," as in the case of the purchase of second trust notes.

Stone illustrates the case of a person conducting a business. The instant proceeding illustrates the case of a person husbanding his assets and securing income by, to use the language in Stone, "[investing] funds * * * for purposes of income." Contrary to Stone, appellee here did not "[make] his own collections, [maintain] records of payments, [nor follow] up delinquent debtors by telephone or letter" or otherwise.

The facts are clear that for the years with which we are concerned appellee did not devote "his full time" or, for that matter, any time, to those activities; and it is further not a fact that appellee in this case "had no income other than interest realized on the notes which he had purchased."

The fact is that appellee was a busy doctor. He devoted all his time to the practice of his profession and relied upon his real estate adviser for the purchase or making of notes or the purchase of real estate. Collections were made by the bank. At the risk of some duplication, it will be remembered that he made no collections; he did not follow up delinquent accounts; and he had no employees or office connected with his investments.

It is not at all important that his portfolio contained investments worth in the neighborhood of $750,000.00. He was a busy doctor, made wise investments, and it is not to his discredit that he is worth the amount of money that he is. Certainly, much of this money was earned in his profession and, for all we know, some of it may have been inherited.

Appellant is not aided by the cases relating to the question of deductibility under Sections 23(a) and 24(a) of the Internal Revenue Act of 1928, 26 U.S. C.A. §§ 23(a) and 24(a). Those sections have to do with items deductible and not deductible under the Revenue Act; they do not apply to unincorporated business taxes. It should be added that in any case in which the District of Columbia levies a tax upon unincorporated businesses the criteria which are to be taken into account for the taxing of such a privilege are not necessarily the same as, or even similar to, those for the Federal tax on income. Cf. Smoot Sand and Gravel Corp. v. District of Columbia, 1958, 104 U.S.App.D.C. 292, 261 F.2d 758, certiorari denied, 1959, 359 U.S. 968, 79 S.Ct. 876, 3 L.Ed.2d 834. To the extent that they may be considered applicable, those cases strongly advance appellee's case. A fair example is that of Kane v. Commissioner of Internal Rev-

enue, 2 Cir., 1938, 100 F.2d 382, 383. There the petitioner, who was apparently a woman of considerable means, deducted from her gross income the sum of $1,-783.13, representing $1,200.00 charged the taxpayer for office rent and the services of a lady who acted as bookkeeper and $583.13 paid a trust company for acting as custodian and for income collections. The facts are stated in the opinion by Circuit Judge Augustus N. Hand as follows:

"In the statement of the evidence it appeared that Louis M. Weiller, the taxpayer's brother, had been associated in business with Louis Heilbroner, her former husband, prior to the latter's death, and that the taxpayer had had no personal experience in business. It also appeared that she inherited from Louis Heilbroner a substantial estate consisting of bonds, stocks and mortgages and consulted her brother in connection with the handling of it. Mr. Weiller testified that:

" 'During 1930 I changed investments continually, substituting and changing, and reinvesting the income.

" 'In connection with the handling of these affairs I made no charge for my services. I charged petitioner a portion of the expenses incurred by me in the conduct of my office, by way of office rent and the services of a secretary or bookkeeper, Miss Quinn, who had been employed by Weber & Heilbroner, and whom I took with me upon my retirement from that business. The services of this secretary or bookkeeper were keeping books, making entries, checking income and advising me as to the status of securities which she followed up. I hadn't time to do that myself.'

"The amount Mr. Weiller charged the taxpayer for rent and the service of the secretary-bookkeeper was $1,200. It also appeared that he and the taxpayer made arrangements with a trust company to act as custodian and to collect the income from various securities, belonging to her and that they agreed to pay a percentage upon the income collections as compensation. For these services the custodian was paid $583.13 in 1930. Mr. Weiller testified that he had work performed in the office for himself similar to that which Miss Quinn performed for his sister. He said that the latter 'entered the petitioner's income, collected it, paid her bills, made out her checks for her personal bills each month, and attended to the various little things pertaining to that kind of work.' He added that Miss Quinn never performed any social duties for petitioner, but that she acted partly as a secretary." 100 F.2d at page 383.

The Board of Tax Appeals held that the taxpayer "merely received income from investments, and this is not a trade or business." In affirming the judgment of the Board, the court said:

"In the prevailing opinion of the Board it was said that the taxpayer 'merely received income from investments, and this is not a trade or business.' While we do not say that the taxpayer might not carry on a business through an agent, it was not shown here that enough was done either by the taxpayer or her agents to constitute the carrying on of a business. To be sure, Mr. Weiller testified that he 'changed investments continually, substituting and changing, and reinvesting the income,' but it is not apparent from that statement to what extent there was activity in buying or selling securities or how far the taxpayer was other than a passive recipient of income or a mere investor either in her own capacity or through her agent. We think it would not be enough to secure or to attempt to secure income or capital stability by conversions of bonds into stock or vice versa, or by otherwise safeguarding the taxpayer's invest-

ments. *To do 'only what is neces-sary from an investment point of view' was said by the Circuit Court of Appeals of the First Circuit to be insufficient to amount to engaging in business.'* (Citing cases.) We are not persuaded that the taxpayer was engaged directly or indirectly in carrying on a business. (Citing cases.) The activities of the tax-payer's brother as to her invest-ments and the employment for per-sonal convenience of a bookkeeper to record financial transactions, or of a bank to cut and collect coupons, did not, in our opinion, amount to the carrying on of a business. If so, every owner of property can obtain an income tax deduction of what-ever sums he may expend to save the trouble of personal attention to his affairs. (Citing cases.) There is no reason to suppose that the em-ployment of a bookkeeper to keep accounts, or of a bank to make in-come collections, is more than a per-sonal, as opposed to a business, ex-pense." Ibid. [Emphasis sup-plied.]

So, in Foss v. Commissioner of Inter-nal Revenue, 1 Cir., 1935, 75 F.2d 326, 327, 328, the First Circuit case quoted in Kane, supra, we find the following:

"A person of property, who de-votes his time to the active manage-ment of it and also to active partici-pation in the management of the companies in which his property is invested, and who maintains an office for that purpose where he spends a substantial part of his time, is car-rying on business within the mean-ing of this statute. If Foss had em-ployed somebody else to look after his affairs, that person would cer-tainly have been engaged in busi-ness; and we think that Foss, in attending to his affairs himself, was equally engaged in business. * * The maintenance of an office for this purpose, though not conclusive, is significant."

Other cases in the Federal sphere are distinguishable from the present case. In most of them the activities of the taxpayer were a good bit akin to those in Stone. In practically all of those cases there were present the elements of time spent by the taxpayer, cost of rental of office space, employment of attorneys, employment of personnel etc. In the present case, we agree with the language of Circuit Judge Hand that we are "not persuaded that the taxpayer was engaged directly or indirectly in carrying on a business." In fact, we are persuaded to the contrary, as was the District Judge.

(b) *The Alleged Business of Renting Real Property.*

■ The District Court found that appellee was "not engaged in the busi-ness of buying and selling real estate". We agree with that finding. His hold-ings consisted mainly of small dwellings near his medical office. The purchases were not made on a continuous, frequent or regular basis. Only one purchase was made during the five tax years in ques-tion. Dr. Brady's testimony that over the past forty years he sold only about five properties and none for profit was uncontradicted. But the basis for the assessment now in question was the al-leged carrying-on or engaging-in the business of *renting* real property, not the business of buying and selling. The assessment was based on the amount of rental income declared by the appellee. Of the several properties held by Dr. Brady he declared rental income only as to a few. The undeclared rental-income properties consisted principally of the small private dwellings located near the situs of his medical office. Nowhere in the record is there a basis for finding that appellee's interest and activity in regard to these latter properties could·be construed as the unincorporated business of renting real estate. Rather these transactions appear to be merely the placing of private funds in a form of security, for the purpose of deriving an earned return or a profit, without a hold-ing out to others or any other form of business activity. No assessment was

made on these properties; no finding was made in regard to them.

However Dr. Brady did declare rental income from four separate holdings; the disputed taxes were levied on the rental income from three of these properties. These three are a store and three apartments, a barber shop and an apartment, and an apartment building with twenty-five units. Of course neither the ownership *per se* nor even the leasing of owned property necessarily constitutes the carrying on of the business of renting real property.[15] The focal point in the inquiry is whether Dr. Brady operated the leased properties. Operation of property is a business.[16]

Admittedly Dr. Brady did not personally manage or operate the properties, but the evidence is inconclusive as to whether Sullivan Bros. (a) effectively insulated him from the active participation in the management or (b) were simply his agents in the operation. Whether Dr. Brady had wholly parted with management and control of these properties is not demonstrated by the testimony, the exhibits, or even the tax return. We think, in view of this uncertainty in the record and the fact that the trial court made no finding in respect to the business of operating or managing the operation of the leased properties, that we should remand this phase of the case for further consideration. It will be so ordered.

Affirmed in part and remanded in part.

BURGER, Circuit Judge (concurring).

I agree with Judge Bastian's opinion but I would underscore one aspect which he has mentioned, namely that the District Court on all the evidence, including oral testimony and documentary evidence, found that Dr. Brady was not engaged in business under the provisions of § 47–1574, D.C.Code (1951). We should

not reverse that holding unless it is clearly erroneous, which it is not. Rule 52, Fed.R.Civ.P., 28 U.S.C.A.

PRETTYMAN, Chief Judge, with whom EDGERTON, BAZELON and FAHY, Circuit Judges, join (concurring in part and dissenting in part).

I agree with the opinion of the court in parts I and II thereof, which deal with the exhaustion of remedies and the involuntariness of the tax payment. And I also agree with the court's disposition, in part III(b), of the point about the management of some of the rented properties. I dissent from part III(a). My views were indicated in the opinion I wrote for the majority of the division, handed down January 7, 1960, and I adhere to those views. The pertinent part of that opinion is printed as an appendix to this dissent.

I think the court fails to recognize well-established differences on two points. First, there is a clear difference between purchasing notes and lending money, even though the loan is secured by a mortgage note. Banks know and observe the difference, because the usury laws apply to one but not to the other. Other laws require licenses, under strict supervision, for one, if the amounts are small, but not for the other. The difference is well established. The whole testimony in this case, including Dr. Brady's and his documentary exhibits, describes his course of action as lending money.

Second, there is a difference between doing business and economic activities which are not doing business, although the line, like many lines in the law, is sometimes hazy. The criterion is, as Mr. Justice Frankfurter pointed out in his concurring opinion in Deputy v. Du Pont,[1] whether one holds himself out to others as the source of goods or services.

15. Zonne v. Minneapolis Snydicate, 1911, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428.

16. District of Columbia v. Pickford, 86 U.S.App.D.C. 17, 179 F.2d 271 (D.C. Cir.1949) ; Harrisburg Hotel Co. v.

United States, 145 F.2d 116, (3 Cir., 1944).

1. 308 U.S. 488, 499, 60 S.Ct. 363, 84 L. Ed. 416 (1940).

This record is conclusive that Dr. Brady, through his agent, held himself out as a source of money for loans on real estate. His agent testified that the difference between the Doctor and a building and loan company was that it took less time to get money from the Doctor.

To say that the Doctor was not in business, because he was "investing", begs the question. A person can "invest" money in the course of conducting a business, and very many do so. Grocers and haberdashers invest their money in a business and conduct the business. It is not helpful in the present sort of problem to say that a grocer is not conducting a business, he is just investing his money. To describe Dr. Brady's activities as "investment in first trust notes" does not advance the discussion. A bank or a loan association makes "investments in notes" when it lends money on first trust security.

The difference between doing business and merely managing one's money as a personal affair was the subject of much and hotly contested litigation in the days when the Internal Revenue Code allowed the deduction of business expenses but not the deduction of expenses incurred for personal investment purposes. The line was drawn in many cases and is as I have stated it.

I read Stone v. District of Columbia [2] exactly contrary to the way my brethren of the majority read it. The facts in that case are like those in this case, except for variations which bring this case more clearly within the tax statute than that one; Dr. Brady's lending of money was more clearly a business than was Stone's purchase of notes. I see no pertinent difference between Stone's devotion of his own time to his business and Brady's use of an agent for that purpose.

I do not read the facts as showing that Dr. Brady "was known to practically only Sullivan Brothers". That firm was his agent, but the loans were made by him, not them, and the notes were payable to him, not them; he must have been known to his debtors.

Incidentally, and parenthetically, my brethren call seven of Dr. Brady's transactions in 1955–56 "note renewals". The record does not so describe them. The record, which is Dr. Brady's own exhibit, describes them as "Refinance transactions", which I understand to include the rearrangement and replacement of existing outstanding loans on property. "Refinancing", as I understand the term, does not mean simply note renewals or extensions. It may, and usually does, involve new loans and new lenders. When a corporation, for instance, says it is going to "refinance" a certain part of its operation, it does not mean that it is merely extending existing notes or bonds.

Appendix to Dissent

Writing for a majority of a division of the court in an opinion promulgated January 7, 1960 (vacated by the court en banc in the opinion of June 30, 1960) Judge Prettyman wrote, in part:

(a) *The Alleged Business of Lending Money.*

It is argued to us that Dr. Brady merely purchased first trust notes, an investment activity on his part. Two questions of law arise, (1) whether the transactions were the lending of money or were the purchase of first trust notes and (2) whether the transactions constituted carrying on a business.

But first, as a preliminary matter, we note that the use of the word "investment" in connection with the foregoing problem does not advance its solution. "Investments" may be made in many sorts of property and also in many sorts of activities or businesses—in real estate, in stocks or other securities, in a grocery store or a construction project. Money might be "invested" in either a money-lending business or in the purchase of a note. To say that one type of transaction is an "investment" does not differentiate it from the other type.

2. 91 U.S.App.D.C. 140, 198 F.2d 601 D.C.Cir.1952).

At least as early as 1787 it was established that lending money and buying trust notes are two entirely different activities.[15] The lending of money involves a lender-borrower transaction in money. It involves the negotiation and execution of a contract between the supplier of the money and the recipient thereof, specifying the terms of an agreement, the dates of payments on the principal, the period of the loan, the interest to be paid, the dates of such payments, and whether security is to be furnished and, if so, the type and amount. The law puts a maximum upon the rate of interest which can be charged on a loan of money. It usually requires that a license be obtained to engage in the business of making small loans.[16] The buying of trust notes, on the other hand, is a merchandising transaction. The purchaser acquires a salable security, as is, for money. The price is a market value, which may be more or less than the face of the security. The law places no restriction upon the amount of money which a purchaser may make upon the sale of purchased notes. The case in 1787, which we have cited,[17] pointed out that a person may purchase a note at any amount of discount without incurring the dangers of usury. The difference between a loan and the purchase of a note, vital in considering the application of the usury laws, is of major importance to banks. It is discussed, with citations, in 8 Zollmann, Banks and Banking § 5192 (Perm.ed.1936).

Whether a given transaction is the lending of money or is the purchase of a note is a question of fact to be determined from the circumstances of a given case.

The second legal question, whether a given series of transactions is or is not a business, has been the subject of many court decisions.[18] Not every loan is a business, but the lending of money can be a business. Not every purchase of securities is a business, but the purchase of securities can be a business. The distinction often applied by the courts is between a passive investor doing only what is necessary from an investment point of view[19] and those whose activities are extensive, varied, continuous and regular. Such activities may constitute a business even though concerned only with a person's own investments.[20] Mr. Justice Frankfurter, concurring in Deputy v. du Pont,[21] drew the line succinctly and clearly. He wrote: "To avail of the deductions allowed by § 23(a) [of the Federal Income Tax Act], it is not enough to incur expenses in the active concern over one's own financial interest. ' * * * carrying on any trade or busi-

---

15. Musgrove v. Gibbs, 1 Dall. 216, 1 U.S. 216, 1 L.Ed.2d 107 (Sup.Ct.Pa.).

16. See, e. g., D.C.Code § 26–601 (1951 ed.).

17. Supra note 15.

18. One of the more important lines of such cases derived from the fact that until 1941 the federal income tax statute allowed the deduction of expenses only when incurred in carrying on a trade or business. 26 U.S.C.A. § 162. (Certain non-business expenses can now be deducted, 26 U.S.C.A. § 212.) On the question whether investing or trading in stocks or securities did or did not constitute a business, see the cases collected in P–H Fed.Tax Serv.Par. 11,015(e).

19. Kane v. Commissioner of Internal Revenue, 100 F.2d 382 (2 Cir., 1938); Foss v. Commissioner of Internal Revenue, 75 F.2d 326 (1 Cir., 1935).

20. L. T. Alverson, 35 B.T.A. 482 (1937); Austin D. Barney, et al., Executors, 36 B.T.A. 446 (1937). See Maloney v. Spencer, 172 F.2d 638, 640 (9 Cir., 1949). Sec. 8.1(g) of the Regulations promulgated by the D. C. Commissioners on Oct. 16, 1950, under the District of Columbia tax statute here involved, provides: "Often the continuity, frequency and regularity of activities, as distinquished from transactions of an isolated or incidental nature, will be the factors which will determine whether or not the activities constitute the carrying on of an unincorporated business."

21. 308 U.S. 488, 499, 60 S.Ct. 363, 84 L.Ed. 416 (1940); and see Helvering v. Wilmington Trust Co., 124 F.2d 156, 158–159 (3 Cir., 1941), reversed on other grounds, 316 U.S. 164, 62 S.Ct. 984, 86 L.Ed. 1352 (1942).

ness,' within the contemplation of § 23 (a), involves holding one's self out to others as engaged in the selling of goods or services." Many criteria are described in the cases as guides for determining whether a given series of activities does or does not constitute doing business, but the underlying guides are whether the person does or does not hold himself out to others for the supply of goods or services and whether the activities are or are not extensive, continuous and regular.

With the foregoing rules in mind we turn to the facts in the case before us. Nothing in the evidence in this record supports the argument that Dr. Brady was merely buying notes. His activities were described by himself, and in great detail by a representative of Sullivan Bros., on the witness stand. Repeatedly these witnesses described the lending of money. For example, Dr. Brady testified as follows:

"[Q.] On March 17, 1952, you made a loan of $11,000.00 to a Mr. O'Keefe? [A.] Yes.

\* \* \* \* \* \*

" \* \* \* that is how I take most of all my loans \* \* \*.

\* \* \* \* \* \*

" \* \* \* I depend on the Sullivan Bros. for the integrity of the man who is borrowing the money."

And the representative of Sullivan Bros. testified:

" \* \* \* This is a schedule of loans \* \* \* made for Dr. Brady \* \* \*.

\* \* \* \* \* \*

"On the loans we would receive a fee from the party that needed the loan."

These are but a few examples of many similar statements. And Dr. Brady presented a series of exhibits entitled "Loans Made & Amount" for the several years. Nowhere in the record did a witness describe the purchase of a note. Indicative of the evidence was the answer of the Sullivan Bros. representative to a question as to why a seeker of funds would go to Dr. Brady instead of to a building and loan association—"Well, usually your main purpose is to save time."

Dr. Brady's money-lending was continuous, frequent and regular. His testimony and that of Sullivan Bros. demonstrate that fact. Dr. Brady had been making loans through Sullivan Bros. at least since 1939. In the tax years here involved (1955 and 1956) he made sixteen loans, totaling $164,700. He clearly held himself out to others as a source of money for borrowers. The record shows that contracts for these loans were negotiated on his behalf by his agent. It is elementary that one may carry on a business by use of an agent; indeed many of the federal income tax cases concern the deduction of compensation paid such agents. It is said that Dr. Brady loaned money only when he had it to loan. The same could be said of any lending institution.

Thus, from the facts of this case, the nature and incidence of the transactions, we think it is abundantly clear that this taxpayer was not simply investing money which he had but rather was receiving requests for loans and then supplying the funds.

Dr. Brady contends that this court's opinion in Stone v. District of Columbia [22] cuts away the basis for saying that his activities constituted the business of money-lending. Quite to the contrary, the case held the taxpayer there to be engaged in business. There we accepted the "well settled" definition of business as that which occupies the time, attention and labor of men for the purpose of a livelihood or profit. Under this definition we held that the purchaser of second trust notes at discount, who did all his own work of record-keeping and of collection, and who was known as a

22. 91 U.S.App.D.C. 140, 198 F.2d 601 (1952).

source of second trust money, was "engaged in business" within the meaning of the statute. The whole purport of the opinion and the cases cited support the view we take here.