**Jeannette LENKIN et al., Petitioners,**

**v.**

**DISTRICT OF COLUMBIA, Respondent.**

**Morris POLLIN et al., Appellants,**

**v.**

**DISTRICT OF COLUMBIA, Appellee.**

**Nos. 21573, 21755.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 19, 1969.

Decided Feb. 17, 1972.

Mr. Werner Strupp, Washington, D. C., with whom Mr. Nathan Sinrod, Washington, D. C., was on the brief, for petitioners in No. 21,573.

Mr. Joel N. Simon, Washington, D. C., with whom Mr. Earl M. Colson, Washington, D. C., was on the brief, for appellants in No. 21,755.

Mr. Robert E. McCally, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Charles T. Duncan, Corporation Counsel at the time the brief was filed, Hubert B. Pair, Principal Asst. Corporation Counsel at the time the brief was filed, Henry E. Wixon, Asst. Corporation Counsel, and Robert C. Findlay, Asst. Corporation Counsel at the time the brief was filed, were on the brief, for respondent in No. 21,573 and appellee in No. 21,755.

Before PRETTYMAN *, Senior Circuit Judge, and McGOWAN and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

These two cases, consolidated in this court, present similar fact patterns and similar issues for our consideration. In each, the assets of a dissolved corporation, consisting chiefly of an apartment building, were distributed, subject to outstanding corporate debts, to its stockholders who promptly discharged the indebtedness and continued, through the medium of a newly-formed partnership, the preexisting corporate business of operating the facility. In each, deductions for depreciation on the apartment property, taken on partnership returns filed under the District of Columbia Income and Franchise Tax Act of 1947,[1] were administratively disallowed, almost totally, as resting upon an improper depreciation basis. In one case, the property's alleged fair market value on liquidation and, in the other, what essentially was its book value at that point, were rejected as appropriate bases; in both, the depreciation base administratively substituted excluded the amount of corporate indebtedness existing at the time of liquidation. The courts whose reviews preceded ours have substantially upheld the administrative determinations.

So, once again, we are called upon to construe provisions of the Income and Franchise Tax Act, but perhaps for the very last time. During the pendency of this appeal,[2] the Act was amended to important respects [3] and the problems now posed will not recur.[4] During the same period, the course of judicial review of District Tax assessments was legislatively altered,[5] and such reviews no longer come to this court.[6] Since, however, these changes are inapplicable to the litigation at hand,[7] we proceed to our task.

I

While factually these cases share much in common, there are differences which must be accounted for in any decision of the questions raised. Our review accordingly begins with a summary of the relevant developments in each.

*The Lenkin Case*

Lencshire House, Inc., a Maryland corporation, was organized on March 21, 1949, and for the next 15 years it ran an apartment building in the District of Columbia. On March 24, 1964, the corporation dissolved and Lencshire House Company, a partnership, was formed. The partners were the corporation's three stockholders at dissolution, and their interests in the partnership coincided with their shareholdings at that time. The corporate assets were distributed, subject to the corporate liabilities, to the stockholders, who took conveyance

* Senior Circuit Judge Prettyman did not participate in the decision or opinion herein.

1. 61 Stat. 328 (1947); D.C.Code §§ 47–1551 et seq. (1967).

2. We deferred disposition of the instant cases pending *en banc* decision of Verkouteren v. District of Columbia, 139 U.S. App.D.C. 303, 433 F.2d 461 (1970), which involved a somewhat related problem.

3. By the District of Columbia Revenue Act of 1969, 83 Stat. 169 (1969).

4. The basis for determining depreciation is now in all cases the same as the basis for determining gain or loss on disposition of property for purposes of federal income taxation under the Internal Revenue Code of 1954. D.C.Code § 47–1583e (Supp. IV 1971).

5. By the District of Columbia Court Reorganization Act of 1970, 84 Stat. 475 (1970).

6. D.C.Code §§ 11–721(a), 11–1201, 47–2704 (Supp. IV 1971).

7. Amendments made by the District of Columbia Revenue Act of 1969 are, by virtue of §§ 606, 607 and 805(a) thereof, inapplicable to the instant litigation, as are those made by the District of Columbia Court Reorganization Act of 1970. See notes 20, 29, *infra*. The statutory provisions utilized in this opinion are, of course, those in effect when the operative events in the cases before us transpired.

of the apartment property as tenants in common and thereafter continued its operation as partners.[8]

On liquidation, the corporation had assets of $756,892.31 and liabilities of $809,751.83, and so a net deficit of $51,859.52.[9] The principal asset was the apartment property, which had book valuations of $42,529.04 for land and, for building and maintenance equipment, $1,070,640.38 less a depreciation reserve of $448,772.29, or a depreciable net of

8. Continued operation in an unincorporated enterprise was previously contemplated. The minutes of the directors' meeting at which the plan of liquidation was recommended for stockholder approval recite that after distribution of the corporate assets "the former stockholders would own and operate the [apartment] property . . . in their individual capacities as members of a joint venture."

9. The corporation's balance sheet as of the date of dissolution and liquidation was as follows:

*ASSETS*

| | Cost | Depreciation Reserve | Net | |
|---|---|---|---|---|
| *Current Assets*: | | | | |
| Cash in Office | | | $ 50.00 | |
| Cash in Bank | | | 18,328.11 | |
| Reserve for Replacements | | | 61,353.35 | |
| Mortgage Escrow Deposits | | | 7,324.80 | |
| *Total Current Assets* | | | | 87,556.26 |
| *Prepaid Taxes* | | | | 4,938.92 |
| *Fixed Assets*: | | | | |
| Land | 42,529.04 | | 42,529.04 | |
| Bldg. & Bldg. Equip.-Fixed | 1,047,228.25 | 425,959.21 | 621,269.04 | |
| Building Equipment-Portable | 22,545.81 | 22,172.55 | 373.26 | |
| Furniture | 4,185.28 | 4,185.28 | -0- | |
| Furnishings | 8,911.93 | 8,911.93 | -0- | |
| Maintenance Equipment | 866.32 | 640.53 | 225.79 | |
| *Total Fixed Assets* | 1,126,266.63 | 461,869.50 | 664,397.13 | 664,397.13 |
| *Total Assets* | | | | $756,892.31 |

*LIABILITIES*

| | | | |
|---|---|---|---|
| *Current Liabilities*: | | | |
| Accounts Payable and Accrued Liabilities | | 7,535.34 | |
| Accrued D. C. Income Taxes | | 762.76 | |
| Accrued Federal Income Taxes | | 4,454.97 | |
| Accrued Liquidation Expenses | | 50.00 | |
| *Total Current Liabilities* | | | 12,803.07 |
| *Fixed Liabilities*: | | | |
| Mortgage Payable | | 793,567.90 | |
| Accrued Interest on Mortgage | | 2,380.86 | |
| *Total Fixed Liabilities* | | | 795,948.76 |
| *Total Liabilities* | | | $808,751.83 |
| *Net Worth*: | | | |
| Capital Stock—Common | | 1,500.00 | |
| Deficit—June 1, 1963 | (64,997.78) | | |
| Profit for period ended 3-27-64 | 11,638.26 | (53,359.52) | |
| *Net Deficit* | | | (51,859.52) |
| *Total Liabilities and Net Deficit* | | | $756,892.31 |

$621,868.09.[10] The corporation's books also recorded paid-in surplus of $1,500.00—the shareholders' capital stock investment—which, in conjunction with an accrued deficit of $64,997.78 as reduced by undistributed profits of $11,638.26 to $53,359.52, produced the net deficit of $51,859.52 referred to.[11] The corporation's main liability was a balance of $795,948.76, principal and accrued interest, on a corporate promissory note secured by the lien of a first deed of trust on the apartment premises.[12] That indebtedness remained outstanding when the corporation dissolved and the conveyance of that property occurred.[13] Thereafter, the partners obtained refinancing and paid the note in full.

On their franchise tax returns for the taxable periods ending at the close of calendar years 1964 and 1965,[14] the partners listed deductions for depreciation on the apartment property. The deductions were predicated upon a fair market valuation of $966,273.37 at inception of the partnership, of which $884,742.45 was allocated to improvements. The District's assessing authorities disallowed the deductions, practically in their entirety,[15] on the theory that property received as a dividend—ostensibly the apartment property—could not enter the depreciation base,[16] and assessed tax deficiencies accordingly. On appeal therefrom,[17] the District of Columbia Tax Court[18] sustained the assessment with but a very minor adjustment.[19] The matter is here on the taxpayers' petition for review.[20]

*The Pollin Case*

Crestwood Apartment Corporation, a Delaware entity, owned and operated an apartment building in the District from its inception in 1950 until its dissolution on January 2, 1962. On the latter date, its assets were $1,679,222.26, including the apartment property valued on the corporation's books at $1,630,848.12 net of depreciation,[21] and its liabilities were $1,576,763.37, of which $1,763.37 was the residue of the corporation's accounts payable and $1,575,000.00 was the unpaid principal balance of an unsecured

10. The figures are aggregates of the categories listed under "fixed assets" in the corporation's closing balance sheet, *supra* note 9, exclusive of land and fully depreciated furniture and furnishings.

11. See note 9, *supra*.

12. See note 9, *supra*.

13. The plan of liquidation specified that the grantees "shall acquire the [apartment] property with the improvements thereon, subject to all mortgages . . . existing as of the date of transfer."

14. The 1964 return, of course, covered only the portion of that year from March 27 through December 31.

15. All of the $39,939.41 deduction for 1964, and $50,866.98 of the $50,983.23 deduction for 1965 was disallowed.

16. The notice of the deficiencies which was sent to the taxpayer contained a statement as follows:

> There is no provision in the D.C. Income and Franchise Tax Act of 1947, as amended to allow any basis for property received as a dividend. Therefore, depreciation in the amounts indicated is disallowed.

17. Pursuant to D.C.Code § 47–1593 (1967), since amended (Supp. IV 1971). See note 7, *supra*.

18. The jurisdiction exercised by that court has since become vested in the Tax Division of the Superior Court of the District of Columbia. D.C.Code § 11–1201 (Supp. IV 1971). See note 7, *supra*.

19. Lenkin v. District of Columbia, CCH D.C.Tax Rptr. ¶ 200–113 (D.C.Tax Ct. Oct. 11, 1967).

20. D.C.Code § 47–2404(a) (1967), since amended (Supp. IV 1971). The petition for review was filed prior to the effective date of the District of Columbia Court Reorganization Act of 1970, see note 7, *supra*. Our jurisdiction is thus unaffected by the amendment of § 47–2404(a) and other provisions made by that legislation. See D.C.Code § 11–1202 (Supp. IV 1971).

21. See note 22, *infra*.

corporate note.[22] Net worth was then $102,458.89, of which $1,200.00 was paid-in surplus—the capital stock investment —and $101,258.89 was earned surplus.[23]

After dissolution, the corporate assets were distributed ratably to the stockholders,[24] who immediately formed a partnership, Crestwood Apartment Company, and continued the operation of the apartment building. Appellants, the distributees, have maintained throughout that on distribution they assumed the corporation's liabilities proportionately to their stockholdings, and that the distribution and assumption were in complete cancellation and redemption of their stock.[25] In any event, it appears without controversy that the distributees, within a matter of days after distribution, paid the corporation's note and accounts payable in full.

Each of the partnership's franchise tax returns for the four calendar years 1962–65 claimed a deduction for depreciation on the apartment building. The deduction was predicated upon an assumed period of useful life and a formulated cost basis.[26] Cost was computed at $1,630,848.12, the aggregate of paid-in surplus, earned surplus and corporate liabilities, minus the aggregate of the distributed assets other than the apartment property.[27] This method of computation, it will be noted, set the cost

22. The pleadings furnish a summary balance sheet for the corporation at the time of dissolution, which the District does not dispute, as follows:

| *Assets* | | *Liabilities and Capital* | |
|---|---|---|---|
| Cash | $36,236.02 | Accounts Payable | $ 1,763.37 |
| Real Property (net of depreciation) | 1,630,848.12 | Unsecured Bank Loan | 1,575,000.00 |
| Claim for refund attributable to net operating loss carryback | 12,138.12 | Capital Stock | 1,200.00 |
| | | Earned Surplus | 101,258.89 |
| | $1,679,222.26 | | $1,679,222.26 |

23. See note 22, *supra*.

24. The distributed assets, aside from the apartment property, were $36,236.02 in cash and a claim of $12,138.12 for a tax refund. See note 22, *supra*.

25. The District has not conceded these two claims, however, and they remained in issue when the litigation reached this court. The record discloses without controversy, however, that the corporate note was indorsed individually by each of the stockholders who became distributees on liquidation.

26. It appears that the apartment building was constructed on land held in a leasehold estate, with the consequence that no part of the base was allocated to land as nondepreciable property.

27. Recapitulated, the computation was as follows:

| | | |
|---|---|---|
| Capital Stock | | $ 1,200.00 |
| Earned Surplus | | 101,258.89 |
| Corporate Liabilities: | | |
| Accounts Payable | $ 1,763.37 | |
| Unsecured Bank Loan | 1,575,000.00 | 1,576,763.37 |
| | | 1,679,222.26 |
| Less Other Assets Received on Liquidation: | | |
| Cash | 36,236.02 | |
| Claim for Refund | 12,138.12 | 48,374.14 |
| Basis for Building | | $1,630,848.12 |

figure for that property at precisely its value on the books of the corporation.[28]

The District's assessing authorities disagreed, however, and fixed the basis for depreciation at $66,222.87. Their standard for measuring basis seemingly was cost to the partnership; and their computation involved aggregation of the $1,200.00 in paid-in surplus and the $101,258.89 in earned surplus and subtraction therefrom of the $36,236.02 in cash distributed on the corporate dissolution. The factor thus chiefly differentiating the partnership's and the District's calculations of basis was the corporate indebtedness of $1,576,763.37 outstanding at liquidation, which the former included, but the latter disallowed.

Tax deficiencies were assessed for each of the four years and were paid under protest, and suit was then filed in the District Court seeking recovery of the excess payments.[29] On the taxpayers' motion for partial summary judgment on the main issue—the inclusions of the corporate liabilities in the depreciation base—the court concluded in the District's favor.[30] The court's final judgment incorporating that ruling is the subject of the appeal brought here.[31]

*The Judicial Rulings*

In the *Lenkin* case, the Tax Court rendered an opinion elucidating the reasoning that led it to affirm the deficiency assessment therein in all material respects.[32] It referred to its holding in Oppenheimer v. District of Columbia [33] "that the basis for depreciation of real property distributed by a corporation to its stockholders was not the unrealized value of the property, but was the capital stock investment of the stockholder . . . plus the earned surplus." [34] It

28. That is because the formula for determining cost of the apartment property to the partnership was essentially the corporation's liabilities and net worth minus its other assets, which like the property itself was distributed to the stockholders—newly the partners—on liquidation.

29. See D.C.Code § 47–1593a (1967), which preserved, optionally for the taxpayer, the common law action for recovery of District taxes paid under protest. See also District of Columbia v. Brady, 109 U.S. App.D.C. 324, 326, 288 F.2d 108, 110 (1960). Section 47–1593a was repealed by the District of Columbia Court Reorganization Act of 1970, 84 Stat. 582 (1970), which also specifically abolished the common law remedy, see D.C.Code § 11–1202 (Supp. IV 1971), but this action, as one properly filed before the effective date of these changes, is not affected thereby. *Id.*

30. The court made a small adjustment in the amount of the tax deficiency on the District's concession that the partnerhip had made capital expenditures during calendar years 1962–65.

31. Pursuant to 28 U.S.C. § 1291 (1964). See note 29, *supra.*

32. Lenkin v. District of Columbia, *supra* note 19.

33. CCH D.C.Tax Rptr. ¶ 200–047 (D.C. Tax Ct. 1964), aff'd, 124 U.S.App.D.C. 221, 363 F.2d 708 (1966).

34. CCH D.C.Tax Rptr. ¶ 200–113 at 10,376. The court elucidated:

> The validity of the ruling in respect of the capital stock investment was obvious. The inclusion of the earned surplus was due to the fact that, since the stockholder was entitled to the corporation's earned surplus, its inclusion in the property distributed was to the extent of its amount or value an investment by the stockholder. Moreover, the capital stock plus the surplus represented the realized value of the property distributed. The "unrealized" value in contemplation of law was no value at all. For this reason in the first *Oppenheimer* case, 101 U.S.App. D.C. 10, 246 F.2d 697 [112 U.S.App. D.C. 239, 301 F.2d 563], it was held that the unrealized value of the property distributed was not a taxable dividend under Section 47–1551c(m) of the Code. As a corlary usable in the second *Oppenheimer*, if, for the purposes of determining the amount of the taxable dividend, unrealized value was not included in the value of the distributed property, it should not be included in valuing the property as a basis for depreciation after the distribution. To put it another way, only the amount invested or the value of that with which the stockholder parted should be the basis of depreciation of the distributed property.

*Id.* at 10,376–77.

read our opinion in the same case—*Oppenheimer II* [35]—as an affirmance of its ruling therein "that only the capital stock investment and the earned surplus was the proper basis for depreciation. . . ." [36] It then expressed its overall conclusion:

> The stipulation of the parties and an exhibit thereto . . . show that the capital stock investment (paid in surplus) of the petitioners in Lencshire House, Inc., was $1,500.00. There was no earned surplus. While it is true that the capital invested by the three stockholders had been dissipated, the amount was actually paid by them. The Court believes that such amount should be the basis for depreciation.[37]

And, having so held, the court ruled out any inclusion in the depreciation base of the indebtedness the corporation owed when it liquidated, subject to which petitioners accepted distribution of the corporate assets in kind.[38]

In *Pollin*, the District Court's ruling on appellants' motion for summary judgment, by which the court substantially sustained the District's assessment of deficiency taxes, was unaccompanied by a written opinion. But the District, in its memorandum to the court in opposition to the motion, relied heavily on the separate opinion in *Oppenheimer II* [39] for its argument that the governing statutes precluded any depreciation allowance at all,[40] and upon the Tax Court's opinion in *Lenkin* for its contention that in any event appellants could not claim a depreciation base beyond the aggregate of the paid-in and earned surpluses of the dissolved corporation at the time of its liquidation. Since the District Court upheld the deficiency assessments, which allow depreciation on a base extending to just that extent, we may safely assume that it rejected the District's first argument but accepted the second, perhaps by a process of reasoning paralleling the Tax Court's. Be that as it may, we treat the problem in each of these two aspects.[41]

## II

The District of Columbia Income and Franchise Tax Act [42] imposes a tax on taxable income of all nonexempt unincorporated entities engaged in business within the District of Columbia or receiving income from sources therein.[43]

35. Oppenheimer v. District of Columbia (*Oppenheimer II*), 124 U.S.App.D.C. 221, 363 F.2d 708 (1966).

36. Lenkin v. District of Columbia, *supra* note 19, CCH D.C.Tax Rptr. ¶ 200–047 at 10,377.

37. *Id.* (footnote omitted).

38. The court said:

> The petitioners seem to believe that the amount of the mortgage indebtedness was in some way an investment, was what was paid for the property by the three stockholders or, at least, was such a binding obligation on them that it amounted to some kind or type of payment or consideration. The mortgage was not that of the three stockholders and they were in no way liable therefore. It was the obligation of the corporation alone. Incidentally, the claim in the petition that the three stockholders paid the mortgage indebtedness is not borne out by the stipulated fact that the indebtedness was settled or paid by refinancing of Lencshire House.
>
> Apparently from the stipulated evidence the mortgage executed by Lencshire House, Inc., permitted that corporation owned by the petitioner, with $1,500.00 only of capital contributed or paid by them, to acquire in 1949 an apartment house worth over a million dollars; and allowed the stockholders to enjoy the proceeds of its operation over a period of fifteen years.

*Id.* at 10,378.

39. *Supra* note 35.

40. See Part III, *infra*.

41. In Parts III and IV, *infra*, respectively.

42. Fully cited *supra* note 1.

43. D.C.Code § 47–1574b, since amended (Supp. IV 1971). The individuals conducting the unincorporated business are liable for payment of the tax, which may be assessed against the business or the individuals or both. D.C.Code § 47–1574d (1967).

Partnership enterprises of the type which our taxpayers conducted are expressly included within the group of entities taxed.[44] Income taxable is net income exceeding the statutory exemption,[45] and net income is gross income less allowable deductions.[46] Our concern, of course, is with the depreciation deduction as it was during the taxable years for which the present taxpayers claimed it.[47]

At that time, Section 47–1557b(a) (7) specified as a "deduction[] [that] shall be allowed from gross income in computing net income" "[a] reasonable allowance for exhaustion, wear, and tear of property used in [a] trade or business. . . ."[48] That section further provided that "[t]he basis upon which such allowances are to be computed is the basis provided for in section 47–1583e".[49] The latter section erected four categories, differentiated by date and method of acquisition of a depreciable asset, and mandated for each the particular depreciation base to be utilized.[50]

Only one or the other of the first two statutory categories could possibly have accommodated acquisitions in consequence of corporate liquidations. One embraced post-1938 acquisitions of property "by purchase," as to which the basis for depreciation was "the cost thereof to the taxpayer."[51] The other covered post-1938 acquisitions of property "in exchange for other property," for which the basis was "the market value thereof at the time of such exchange."[52] Each taxpayer group before us strives to bring itself into one of these classifications.

The *Lenkin* petitioners invoke initially the second category—and its market value criterion—contending that they received their apartment property "in exchange for" their shares of stock in the dissolved corporation they formerly owned. Our decisions, however, have maintained undeviatingly that distributions of a corporation's property to its stockholders are neither sales nor exchanges even if as a part of the transaction the distributee's shares are cancelled.[53] Moreover, in *Oppenheimer*

44. D.C.Code § 47–1574 (1967).

45. D.C.Code § 47–1574a (1967).

46. D.C.Code § 47–1557 (1967).

47. See note 7, *supra*.

48. "A reasonable allowance for exhaustion, wear, and tear of property used in the trade or business, including a reasonable allowance for obsolescence; and including in the case of natural resources allowances for depletion as permitted by reasonable rules and regulations which the Commissioners are hereby authorized to promulgate. The basis upon which such allowances are to be computed is the basis provided for in Section 47–1583e." D.C. Code § 47–1557b(a) (7) (1967), (since amended Supp. IV 1971).

49. See note 48 *supra*.

50. In relevant part that section provided:

The bases used in determining the amount allowable as a deduction from gross income under the provisions of section 47–1557b(a) (7) shall be—

(a) where the property was acquired after December 31, 1938, by purchase, the basis shall be the cost thereof to the taxpayer;

(b) where the property was received in exchange for other property after December 31, 1938, the basis shall be the market value thereof at the time of such exchange;

(c) where the property was inherited or acquired by gift after December 31, 1938, the basis shall be that defined in subsection 47–1583(b) (3);

(d) if the property was acquired prior to January 1, 1939, the appropriate basis set forth in subsection (a), (b), or (c) of this section shall be used: *Provided, however*, That the taxpayer may, at his option, use as the basis the market value of such property as of January 1, 1939. . . .

D.C.Code § 47–1583e (1967), since amended (Supp. IV 1971).

51. See note 50, *supra*.

52. See note 50, *supra*.

53. Verkouteren v. District of Columbia, *supra* note 2, 139 U.S.App.D.C. at 308, 433 F.2d at 466; *Oppenheimer II, supra* note 35, 124 U.S.App.D.C. at 224, 363 F.2d at 711; Doyle v. District of Columbia, 124 U.S.App.D.C. 207, 363 F.2d 694 (1966); Estate of Uline v. District of

*II*,[54] we rejected precisely the same argument when made by another taxpayer who likewise sought market value as the basis for depreciating property derived in the course of a corporate liquidation. There we said:

> In classic corporate theory, however, uncomplicated by tax considerations, the liquidating distribution by a dissolved corporation of its assets to its shareholders does not partake of the nature of a bargained sale or exchange. One of the rights of a stockholder is to share in the distribution of the assets of a corporation as and when it goes out of existence. His shares are turned in for extinction, and he takes as of right his proportion of the assets formerly owned by the corporation.[55]

The *Pollin* appellants, on the other hand, resort to the first statutory category, urging us to treat the transaction by which they came into individual ownership of their apartment house as a "sale." Their argument rests on the premise that they assumed their former corporation's liabilities when it dissolved and liquidated;[56] that assumption of personal responsibility, the argument goes, made them purchasers of the assets they received on distribution. To be sure, as these appellants say, stockholder-distributees of a dissolved corporation take the corporate assets subject to the unsatisfied claims of corporate creditors,[57] and there is authority recognizing an equitable liability on the recipients to contribute pro rata to the discharge of corporate debts from the assets received.[58] Just as surely, on familiar principles, full responsibility for discharge of corporate liabilities befalls anyone who validly assumes them personally. But none of these considerations alters the fundamental character of the relationship in which the corporation and its stockholders stand upon a liquidating distribution. In *Oppenheimer II*,[59] we held that the distribution "does not partake of the nature of a bargained sale or exchange,"[60] and that the distributee takes, not by purchase, but "as of right."[61] That is not made the less so by the inferiority of the distributee's title to the creditor's claim, which is inevitably associated with distributions by corporations which are not free of debt.[62] And whether or not an accompanying assumption of personal liability for corporate debts otherwise begets consequences for the distributee's depreciation base, it does not convert the distribution into a sale or a purchase.

█ We conclude that the liquidating distributions in suit do not fall squarely within either of the four categories for which Section 47–1583e specified a basis upon which depreciation deductions were to be made. That means, of course, that if the taxpayers before us were authorized to take deductions of that kind at all, their entitlement flowed from a different source. We confront, then, the question whether Section 47–1583e bars the deduction to those who cannot bring themselves within its terms and, if not, the further question as to the proper de-

Columbia, 124 U.S.App.D.C. 5, 7, 360 F.2d 820, 822 (1966); Berliner v. District of Columbia, 103 U.S.App.D.C. 351, 353–356, 258 F.2d 651, 653–656, cert. denied, 357 U.S. 937, 78 S.Ct. 1384, 2 L.Ed.2d 1551 (1958).

54. *Supra* note 35.

55. 124 U.S.App.D.C. at 224, 363 F.2d at 711.

56. See note 25, *supra*, and accompanying text.

57. *E. g.*, Neill v. Phinney, 245 F.2d 645, 651–652 (5th Cir. 1957) (applying Oklahoma law); Radermacher v. Daniels, 64 Idaho 376, 133 P.2d 713, 715 (1943); Ortego v. Nehi Bottling Works, 182 So. 365, 369–370 (La.App. 1938).

58. *E. g.*, Marshall v. Fredericksburg Lumber Co., 162 Va. 136, 173 S.E. 553, 557–558 (1934).

59. *Supra* note 35.

60. 124 U.S.App.D.C. at 224, 363 F.2d at 711.

61. *Id.*

62. See cases cited *supra* notes 57–58.

preciation base in instances of the present sort. To the first of these questions we now turn.

## III

Depreciation deductions are allowable under only statutory authorization.[63] Constitutional implications aside, it is for the legislature to subject or to immunize income from taxation, and to select the methods for doing so. Immunization through permissible deductions thus resides well within the legislative domain. A deduction "depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed."[64]

On that ground, the District argues that under the then-governing statutes the complaining parties could deduct nothing for depreciation on their apartment houses. The last sentence of Section 47–1557b(a) (7) referred to Section 47–1583e for the appropriate base to be utilized in depreciation computations,[65] and the latter section particularized four situations wherein depreciation was allowable and specified the respective bases for them.[66] There was no foundation for the deduction here, so the argument runs, because Section 47–1583e afforded none. That position, however, is maintainable only if the dispensation that section bestowed furnished the exclusive license for depreciation deductions. We think it did not; we believe, rather, that ample authorization for some such deductions was conferred by Section 47–1557b(a) (7) without regard to Section 47–1583e or the reference in Section 47–1557b(a) (7) to it.

We have already observed that Section 47–1557b(a) (7) made provision for "[a] reasonable allowance for" depreciation on a taxpayer's business property.[67] We have noted, too, that that section explicated that a deduction therefor "shall be allowed from gross income in computing net income."[68] In *Oppenheimer II*,[69] we referred to these provisions as manifestations of "the clear purpose on the part of Congress to allow a deduction from gross income" for such depreciation.[70] If there had been nothing more than Section 47–1557b(a) (7), we fail to see how the legislative intent could have been plainer.

The question, then, becomes whether Section 47–1583e somehow negated Section 47–1557b(a) (7)'s boon of some "reasonable allowance for" depreciation on business property. Obviously, taxpayers were empowered to take deductions for depreciation on business assets acquired in modes which Section 47–1583e mentioned, but their disqualifications for deductions on assets acquired through some event not mentioned is not at all obvious. Neither section contained language which unambiguously disentitled a taxpayer who came by

63. Deputy v. Du Pont, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). See also Wisconsin Elec. Power Co. v. Wisconsin Dept. of Taxation, 251 Wis. 346, 29 N.W.2d 711, 714 (1947).

64. New Colonial Ice Co. v. Helvering, *supra* note 63, 292 U.S. at 440, 54 S.Ct. at 790.

65. See note 48, *supra*.

66. See note 50, *supra*.

67. See note 48, *supra*, and accompanying text.

68. See note 48, *supra*, and accompanying text.

69. *Supra* note 35.

70. 124 U.S.App.D.C. at 223, 363 F.2d at 710. Similarly, in Broadcasting Publications, Inc. v. District of Columbia, 114 U.S.App.D.C. 163, 166, 313 F.2d 554, 557 (1962), we said in reference to § 47–1557b (a) (7):

> This statute establishes no particular method or pattern of allowable depreciation but to hold that it allows none or disallows any particular kind of depreciation method would negate the plain congressional intent to permit some allowance for a universally recognized sound business practice.

property through some event as to which Section 47–1583e was silent. The most that can be said is that while Section 47–1551b(7) purported to make the deduction available to all taxpayers owning business property, Section 47–1583e failed to identify a basis for its computation.

Statutes "are 'instruments of government,' not 'exercises in literary composition.'"[71] Our challenge is to give significance to every provision of a legislative enactment.[72] We must, in the process, reconcile superficial conflicts to the fullest extent possible,[73] and heed always the statute's underlying policy and spirit of the legislation.[74] Doing so, we are unable to read either the last sentence of Section 47–1557b(a) (7) or the language of Section 47–1583e as restrictive provisions outlawing Section 47–1557b(a) (7)'s specification of "[a] reasonable allowance for" depreciation in situations which Section 47–1583e did not describe.

Section 47–1557b(a) (7), as we have just said, was the section conferring the depreciation deduction. Section 47–1583e was a complementing section; its function manifestly was to specify depreciation bases in four enumerated instances. We find no language in Section 47–1583e which smacked of a hacking down, as distinguished from an augmentation, of Section 47–1557b(a) (7). Had Congress intended the narrower Section 47–1583e to cut the broader Section 47–1557b(a) (7) down to equivalent size, we would expect words considerably more emphatic. And to totally deprive Section 47–1557b(a) (7) of operation where business assets are derived in a corporate liquidation is patently to water down the language Congress did use in that section.

Atop that, the four categories for which Section 47–1583e prescribed depreciation bases covered well nigh every transaction by which a taxpayer could acquire business property save a corporate liquidation. No reason for denying stockholder-distributees the depreciation deduction which that section made general is apparent.

A stockholder may have an unrecovered investment in property distributed corporately not unlike that which a purchaser for value has in property bought on the open market.[75] The stockholder may have, indeed, a personal investment in a distributed asset the likes of which an heir to or a donee of property can hardly match.[76] And the stockholder's *financial stake—in terms of actual cost* —in the distributed asset may greatly exceed that possessed by one who gave little in exchange for property he received, but who is nonetheless empowered to use the usually higher market value of the property as his basis for depreciation.[77] We are taught that "[n]othing but unmistakable language will warrant such construction of a statute as will produce unequal operation

71. Salt River Project Agricultural Improvement & Power Dist. v. FPC, 129 U.S.App.D.C. 117, 121, 391 F.2d 470, 474, cert. denied, Arkansas Valley G & T, Inc. v. Federal Power Comm., 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968), quoting United States v. Shirey, 359 U.S. 255, 260, 79 S.Ct. 746, 3 L.Ed.2d 789 (1959).

72. Fisher v. District of Columbia, 82 U.S. App.D.C. 371, 372–73, 164 F.2d 707, 708–709 (1947); United States v. Public Utils. Comm., 80 U.S.App.D.C. 227, 231, 151 F.2d 609, 613 (1945); King v. District of Columbia, 51 App.D.C. 160, 162, 277 F. 562, 564 (1922).

73. Montgomery Charter Serv., Inc. v. Washington Metropolitan Area Transit Commission, 117 U.S.App.D.C. 34, 38, 325 F.2d 230, 234 (1963); Maiatico v. United States, 112 U.S.App.D.C. 295, 301, 302 F.2d 880, 886 (1962); Fisher v. District of Columbia, *supra* note 72, 82 U.S. App.D.C. at 372, 164 F.2d at 708.

74. Richmond, F. & P. R.R. Co. v. Brooks, 91 U.S.App.D.C. 24, 27, 197 F.2d 404, 407, cert. denied, 344 U.S. 828, 73 S.Ct. 31, 97 L.Ed. 644 (1952).

75. See D.C.Code §§ 47–1583e(a) (1967), since amended (Supp. IV 1971).

76. See D.C.Code §§ 47–1583e(c) (1967), since amended (Supp. IV 1971).

77. See D.C.Code §§ 47–1583e(b) (1967), since amended (Supp. IV 1971).

thereof." [78] Lacking a stronger indication in the language of Section 47–1583e that Section 47–1557b(a) (7) was to be cut down to equivalent size, we are unwilling to attribute to Congress a purpose to effect what in given instances would have been a rank discrimination against recipients of property in corporate liquidations.

It is noteworthy that while the District's tax authorities have for a good many years approved depreciation deductions on properties so received much too conservatively for some, they did not subscribe to the theory that deductions on such properties were statutorily unwarranted.[79] The taxpayers at bar were indulged some deduction for depreciation, as were others before them,[80] and we think that treatment bears significance. Contemporaneous i interpretation of a statute by those assigned to oversee it commands great respect,[81] and courts should accept it absent compelling indication that it is wrong.[82] Beyond that, "courts have less reluctance [to avoid a tight construction] when the interpretation they approve has been adopted by the agency charged with principal responsibility for administering the legislation, acting in the light of its special experience and expertise." [83]

The District of Columbia Tax Court, which functioned as the judicial specialist in the field of District taxation, has shared the position of the District assessors.[84] And even on the two prior occasions when this court was called upon to review the treatment of depreciation deductions in the area now questioned, it left that position—some allowable depreciation—untouched.[85] In *Oppenheimer II*,[86] the court did so over the strong protest of one judge that the statutory scheme precluded any depreciation allowance at all; [87] and while the majority found it unnecessary to pass on the point,[88] it did indicate that at the very least Congress had not slammed the door shut.[89] And, perhaps significantly for this case, the *Oppenheimer II* major-

78. L. B. Wilson, Inc. v. FCC, 83 U.S.App. D.C. 176, 183, 170 F.2d 793, 800 (1948).

79. That has been so at least as early as our decision in *Oppenheimer II*, *supra* note 35, which was in 1966.

80. See *e. g.*, *Oppenheimer II*, *supra* note 35, 124 U.S.App.D.C. at 225, 363 F.2d at 712; Oppenheimer v. District of Columbia, *supra* note 33.

81. Udall v. Tallman, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Thompson v. Clifford, 132 U.S.App.D.C. 351, 363, 408 F.2d 154, 166 (1968); City of Los Angeles v. FMC, 128 U.S.App.D.C. 156, 159, 385 F. 2d 678, 681 (1967).

82. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1961); National Ass'n of Theatre Owners v. FCC, 136 U.S.App.D.C. 352, 358, 420 F.2d 194, 200 (1969), cert. denied, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed. 2d 102 (1970); Trans World Airlines v. CAB, 128 U.S.App.D.C. 126, 138, 385 F. 2d 648, 660 (1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1123 (1968); Brotherhood of Railroad Trainmen v. Akron & B. B. R.R., 128 U.S.App. D.C. 59, 90, 385 F.2d 581, 612 (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968).

83. Los Angeles Mailers Union No. 9, Int'l Typographical Union v. NLRB, 114 U.S. App.D.C. 72, 75, 311 F.2d 121, 124 (1962).

84. See Oppenheimer v. District of Columbia, *supra* note 33; Lenkin v. District of Columbia, *supra* note 19.

85. *Oppenheimer II*, *supra* note 35, Snow v. District of Columbia, 124 U.S.App.D.C. 69, 73, 361 F.2d 523, 527 (1965).

86. *Supra* note 35.

87. 124 U.S.App.D.C. at 225–230, 363 F.2d at 712–717 (separate opinion).

88. 124 U.S.App.D.C. at 224–225, 363 F.2d at 711–712. That is because the taxpayer there involved had already taken on past tax returns depreciation deductions in excess of any allowable on any theory than a market value depreciation base.

89. In rejecting the taxpayer's argument that the basis for property received in a corporate liquidation should be set at market value as specified in Section 1583e(3), we said:

> To do so would be to say that a stockholder, simply by deciding to dissolve and liquidate the corporation, may ac-

ity took pains to point out that the District had agreed that a depreciation deduction was in some measure appropriate,[90] a premise the District has obviously forsaken in this case.

In construing tax statutes, no less than others, "[t]he court's effort must be to discern dispositive legislative intent by 'projecting as well as it could how the legislature would have dealt with the concrete situation if it had but spoken.'"[91] It is not, of course, absolutely beyond the realm of possibility that had Congress articulated a rule specifically referrable to the situation at hand, it might have banned the depreciation deduction for distributees in corporate liquidations altogether. But "[w]e must decide questions of legislative intent by the lights we have, not those we might have had."[92] Abiding that admonition, and for the reasons discussed, we conclude that such distributees are not to be deprived of the "reasonable allowance for" depreciation which Section 47–1557b(a) (7) bestows, and that some suitable deduction for depreciation on the present litigants' apartment houses is statutorily warranted.

## IV

We are thus brought to the question which lies at the heart of this litigation: the basis upon which that "reasonable allowance for" depreciation is to be determined in situations where a taxpayer's business property is acquired in a corporate liquidation. Contrary to the Tax Court's reading[93] of our opinion in *Oppenheimer II*,[94] we did not there decide that issue,[95] nor have we specifically dealt with it in any other case.[96] Indeed, we have not been referred to, nor have we found, any decision involving a statute authorizing a depreciation deduction without particularizing the base from which it is to be calculated. We think, nonetheless, that the grant of "[a] reasonable allowance for" depreciation incorporates the concept of a deduction with a basis as well as other components demonstrably reasonable. We think, too, that fundamental considerations dictate just what the basis for business property received in a liquidating distribution to stockholders of a dissolved corporation should be.

When we deal with depreciation, "[t]he end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets."[97] To the corporate distributee in kind, those consequences can receive accurate measurement only in terms of the distributee's investment

quire a depreciation base consisting of a book write-up of a value on which, very properly, no tax need be paid upon its receipt by the stockholder. We think it much more likely that Congress intended to have its express—and only—language in the District taxing statute on corporate distributions in liquidations point the way for handling the depreciation basis of property distributed in liquidation.

*Id.* at 224, 363 F.2d at 711.

90. There, as we said, "the District signified its agreement with the proposition that 'real property which has been received in kind on a corporate dissolution, and which is subsequently used in a trade or business, can be depreciated, [even] absent a specific statutory provision governing proper basis for depreciation . . .'," and that "[t]he District went on to say that it considered the proper basis of computation to be that prescribed by the Tax Court." *Id.* at 225, 363 F.2d at 712.

91. District of Columbia v. Orleans, 132 U.S.App.D.C. 139, 140, 406 F.2d 957, 958 (1968), quoting City of Chicago v. FPC, 128 U.S.App.D.C. 107, 113, 385 F.2d 629, 635 (1967).

92. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 22 n. 26, 405 F.2d 1082, 1090 n. 26 (1968), cert. denied, American Broadcasting Companies v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

93. See text *supra* at note 36.

94. *Supra* note 35.

95. See note 88, *supra*, and accompanying text.

96. The problem in Snow v. District of Columbia, *supra* note 85, was quite different. See note 112, *infra*.

97. Detroit Edison Co. v. Commissioner of Internal Revenue, 319 U.S. 98, 101, 63 S.Ct. 902, 87 L.Ed. 1286 (1943).

in the assets he receives. That investment represents his cost, and is his capital which is subject to financial diminution by the ravages of time and use. A depreciation base shaped by the distributee's investment equates well with the basis Section 47–1583e prescribed for the type of acquisition most analogous to the corporate in-kind distribution.[98] It also approximates the cost-of-acquisition approach taken by District assessing authorities and the Tax Court to the problem at hand.[99] We think that when the legislature leaves for the courts the definition of basis for "reasonable" depreciation allowances, their polestar is a basis that will enable the taxpayer to recover his investment in the asset—no more, but certainly no less.[100]

One thing is clear, however. Corporate liquidations sometimes presage what is merely a change in the form of operation of a business without any significant change in its ownership. The change may be from one corporation to another corporation or perhaps to an unincorporated organization serving substantially the same set of investors. Another common variation is a corporate liquidation followed by continuation of all or some of the corporation's business by one or more of its stockholders. Although there is a formal transfer of title, in many cases there is no real change in the transferee's investment in the transferred assets. Absent a change upward, a step-up of the transferee's depreciation base will not be permitted, and that we made plain in *Oppenheimer II*.[101] On liquidation of a corporation, a shareholder acquired real properties which, because of unrealized depreciation over their cost to the corporation, commanded a market value greatly in excess of the shareholder's capital investment in her shareholdings and her proportionate share of the corporation's earned surplus. In *Oppenheimer I*,[102] we had held that the unrealized appreciation in value of the distributed property was not taxable as a "dividend" to the stockholder—that only her share of the corporation's earned surplus was taxable as such.[103] The taxpayer thereafter operated the distributed properties as an unincorporated business and took a depreciation deduction based on the fair market value of the properties at the time of distribution. We sustained the Tax Court's view "that Congress could not have intended that petitioner acquire, by virtue of a corporate liquidation, a stepped-up depreciation base largely comprised of an untaxed, because unrealized, rise in market value."[104] Accordingly, we declined the taxpayer's invitation to hold "that a stockholder, simply by deciding to dissolve and liquidate the corporation, may acquire a depreciation base consisting of a book write-up of a value on which, very properly, no tax need be paid upon its receipt by the stockholder."[105]

In what, then, does the stockholder's investment in a depreciable asset consist where he obtains it in a corporate liquidation? The propriety of including two items requires but little discussion. The sum paid for corporate stock—which is reflected in the corporation's paid-in surplus—is the stockholder's cost of achieving the status of

98. See D.C.Code § 47–1583e(a) (1967), since amended (Supp. IV 1971).

99. See text *supra* at notes 79, 84.

100. We must, then, disagree with the Tax Court's conclusion in *Lenkin* "that only the capital stock investment and the earned surplus was the proper basis for depreciation" in cases of this type, CCH D.C. Tax Rptr. ¶ 200–113 at 10,377, and with the District Court to the extent that in *Pollin* it may have subscribed to that theory.

101. *Supra* note 35.

102. District of Columbia v. Oppenheimer *(Oppenheimer I)*, 112 U.S.App.D.C. 239, 301 F.2d 563 (1962).

103. *Id.* at 240, 301 F.2d at 564.

104. 124 U.S.App.D.C. at 223, 363 F.2d at 710.

105. *Id.* at 224, 363 F.2d at 711.

stockholder. As the Tax Court held in *Lenkin*,[106] it is thus a part of his investment in corporate property distributed to him on liquidation.[107] The stockholder's proportionate share of earned surplus is his vested interest in previously undistributed corporate profits,[108] taxable on his receipt as a dividend includable in gross income.[109] As the Tax Court held in *Oppenheimer II*,[110] it also is part of his investment in the corporation, and so in any asset it distributes on liquidation. On the other hand, it is clear that other assets—than the asset for which a depreciation basis is sought—which the stockholder gets on liquidation comprise a return of part of his investment in the corporation, and so a reduction of his investment in the asset in question. So much is clear, and that much takes care of all cost claims the taxpayer asserts in these cases except the unsatisfied debts of the two corporations at the time of distribution.

In utilizing a market value basis for the depreciation deductions taken on their tax returns, the petitioners in the *Lenkin* case run afoul of our *Oppenheimer II* holding. The fair market value base of $884,742.45 which they employed was a considerable increase over the apartment property's net-of-depreciation value of $621,868.09 on the books of the corporation.[111] We are requested to reconsider our *Oppenheimer II* ruling, particularly in light of our ruling in Snow v. District of Columbia,[112] and to recognize market value as an appropriate basis despite any concomitant step-up. Even if as a panel we possessed authority to overrule the *Oppenheimer II* decision of another panel,[113] we are not in the least persuaded that we should do so.

The *Lenkin* petitioners do not rest, however, solely on a prayer for recognition of a market value basis. In the Tax Court they vied alternatively, as also they do here, for a ruling that would peg the depreciation base at not

106. *Supra* note 19.

107. CCH D.C. Tax Rptr. ¶ 200–113 at 10,-376.

108. See D.C.Code § 47–1551c(m) (1967), since amended (Supp. IV 1971); Berliner v. District of Columbia, *supra* note 53. See also Verkouteren v. District of Columbia, *supra* note 2, 139 U.S.App.D.C. at 306–307, 433 F.2d at 464–465; *Oppenheimer II*, *supra* note 35, 124 U.S.App.D.C. at 223, 363 F.2d at 710; Doyle v. District of Columbia, *supra* note 53; Snow v. District of Columbia, *supra* note 85, 124 U.S.App.D.C. at 71–72, 361 F.2d at 525–526; Estate of Uline v. District of Columbia, *supra* note 53; Bord v. District of Columbia, 120 U.S.App.D.C. 175, 177, 344 F.2d 560, 562 (1965).

109. See the cases cited *supra* note 108.

110. *Supra* note 35. Repeating the Tax Court:

> The inclusion of the earned surplus was due to the fact that, since the stockholder was entitled to the corporation's earned surplus, its inclusion in the property distributed was to the extent of its amount or value an investment by the stockholder. Moreover, the capital stock plus the surplus represented the realized value of the property distributed.

CCH D.C. Tax Rptr. ¶ 200–113 at 10,376.

111. See text *supra* at note 10.

112. *Supra* note 85. There the taxpayer purchased for $1 million cash all of the stock of a corporation owning $1 million in assets, and then liquidated the corporation immediately and invested himself with all of its assets. One of the taxpayer's claims was for depreciation computed on his cost of an apartment building thus acquired, and the District's tax authorities allowed depreciation based on the corporation's book value. Treating, under its peculiar circumstances, the transaction as a sale or exchange, the court concluded that "a reasonable allowance is the proper proportion of the cost to Snow, which is the value of the stock he turned over for the property. Since he paid cash for that stock so nearly immediately to his acquisition of the depreciable property, no valuation problems seem to arise." *Id.* 124 U.S.App.D.C. at 73, 361 F.2d at 527. We deem *Snow's* depreciation ruling, on its facts, not at odds with our depreciation ruling in *Oppenheimer II*, *supra* note 35.

113. See, *e. g.*, Insurance Agents' Int'l v. NLRB, 104 U.S.App.D.C. 218, 260 F.2d 736 (1958), aff'd, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); Davis v. Peerless Ins. Co., 103 U.S.App.D.C. 125, 127, 255 F.2d 534, 536 (1958).

less than the amount of the indebtedness on their apartment house when it was conveyed to them. It will be remembered that at that time the corporation owed $795,948.76 in principal and accrued interest on a note secured by a first trust lien on the apartment property, and that the property was conveyed to them subject to that indebtedness;[114] it will also be recalled that the corporation had additional liabilities of $12,803.07.[115] And in the *Pollin* case, it was $1,576,763.37 in corporate liabilities outstanding on liquidation that has always been the largest single factor in the depreciation base for which the appellants therein contend.[116] Thus, in both cases, we must consider the role that corporate indebtedness, unsatisfied when distribution of assets in liquidation occurs, may legitimately play in the formulation of the taxpayer's basis for future depreciation.

V

Credit has long since supplanted cash as the principal medium of large-scale financial intercourse. Purchases of business property on credit, extended for some or all of the purchase price, are commonplace. Typically the purchaser binds himself personally to pay the balance of purchase price or to repay the loan which partially finances the purchase, as the case may be. Frequently the purchaser's obligation is secured by a lien on property, which may be and usually is the purchased property. Sometimes the property itself is bound for the obligation without any accompanying personal liability on the purchaser's part. Ever so often property already encumbered is purchased, and the purchaser may or may not assume the existing obligation. These are everyday facts of life in the business world, and variations in technique are myriad.

There is another important fact of commercial life. One who buys a business asset invests in that asset, whether he pays cash for it or obtains it on credit. In the one case, he will part with money or money's worth immediately; in the other, he or the purchased property—perhaps both—will be bound to an obligation to repay the financing loan. Thus the cost of the property—the economic burden of acquisition—falls on the purchaser in either event. And so the businessman seeks recoupment of his investment in a depreciable asset by depreciation deductions spread over the useful lifetime of the asset, whether he bought it for cash or on time.

We perceive no sound reason authorizing tax officials or courts to ignore these realities or to pursue a course of tax treatment at variance with them. We find similarly unappealing an approach to depreciation under Section 47–1557b(a) (7) which takes for its basis the taxpayer's equity in property rather than his economic cost of acquiring it. The statutory grant is a deduction for depreciation of "property used in [a] trade or business,"[117] and we are not persuaded "property" means only the taxpayer's equity therein.

We follow the lead of the Supreme Court in dealing with a cognate problem. In Crane v. Commissioner of Internal Revenue,[118] the taxpayer was devisee of apartment property possessing an appraised market value exactly equal to the unpaid balance of an existing mortgage on it. Never assuming the mortgage, the taxpayer held the property for several years, taking depreciation deductions in almost the maximum amount allowable. She then sold the property subject to the mortgage, realizing but a small amount of cash therefrom. By the applicable statute, the Revenue Act of 1938,[119] her basis for determining gain

114. See text *infra* at notes 12–13.

115. See note 9, *supra*.

116. See note 27, *supra*.

117. See note 48, *supra*.

118. 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947).

119. 52 Stat. 447, ch. 289 (1938).

or loss on the sale was the basis specified in Section 113(a) (5) of the Act[120] adjusted by addition of the amount of depreciation allowable during the taxpayer's holding period.[121] The unadjusted basis provided by Section 113(a) (5) for property acquired by devise was the fair market value of the "property" at the time of the devisee's acquisition. The taxpayer argued that the "property" she acquired and sold was only her equity therein, which at acquisition had a zero value, with the result that there was nothing at all to depreciate,[122] and so there was no depreciation to adjust her acquisition basis downward. The Court, however, refused to accept that interpretation and instead approved the inclusion of depreciation allowable during the holding period in the taxpayer's adjusted basis. The Court pointed out that a prime "reason why the word 'property' in § 113(a) should not be construed to mean 'equity'" was "the bearing such construction would have on the allowance of deductions for depreciation and on the collateral adjustments of basis."[123] Federal tax laws permitted a deduction from gross income of "a reasonabie allowance for" depreciation "of property,"[124] and specified that the basis for depreciation was the basis for determining gain or loss on sale of the property which, as stated, was the Section 113(a) basis adjusted for allowable depreciation.[125] The Court elucidated:

> Under these provisions, if the mortgagor's equity were the § 113(a) basis, it would also be the original basis from which depreciation allowances are deducted. If it is, and if the amount of the annual allowances were to be computed on that value, as would then seem to be required, they will represent only a fraction of the cost of the corresponding physical exhaustion, and any recoupment by the mortgagor of the remainder of that cost can be effected only by the reduction of his taxable gain in the year of sale. If, however, the amount of the annual allowances were to be computed on the value of the property, and then deducted from an equity basis, we would in some instances have to accept deductions from a minus basis or deny deductions altogether. The Commissioner also argues that taking the mortgagor's equity as the § 113(a) basis would require the basis to be changed with each payment on the mortgage, and that the attendant problem of repeatedly recomputing basis and annual allowances would be a tremendous accounting burden on both the Commissioner and the taxpayer. Moreover, the mortgagor would acquire control over the timing of his depreciation allowances.
>
> Thus it appears that the applicable provisions of the Act expressly preclude an equity basis, and the use of it is contrary to certain implicit principles of income tax depreciation, and entails very great administrative difficulties.[126]

For exactly the same reasons, we reject a reading of Section 47–1557b(a) (7) that would limit the "property" of which it speaks merely to the taxpayer's equity in it.[127] We do so mindful that

120. 52 Stat. 490 (1938).

121. Revenue Act of 1938, ch. 289 § 113(b), 52 Stat. 493 (1938).

122. Such was her position notwithstanding that, as stated, she had taken depreciation deductions during each year of the holding period.

123. 331 U.S. at 9, 67 S.Ct. at 1052.

124. Revenue Act of 1938, ch. 289, § 23(*l*), 52 Stat. 460 (1938).

125. Revenue Act of 1938, ch. 289, §§ 23(n), 114(a), 52 Stat. 462, 494 (1938).

126. 331 U.S. at 9–10, 67 S.Ct. at 1052 (footnotes omitted).

127. Compare District of Columbia v. ACF Industries, Inc., 122 U.S.App.D.C. 12, 15, 350 F.2d 795, 798 (1965); Bord v. District of Columbia, *supra* note 108, 120 U.S.App.D.C. at 178, 344 F.2d at 563; Broadcasting Publications, Inc. v. District of Columbia, *supra* note 70, 114 U.S.

the *Lenkin* petitioners took conveyance of their apartment property subject to the mortgage on it but without an assumption;[128] that there is an unresolved controversy as to whether the *Pollin* appellants personally assumed the unpaid corporate note when they acquired their apartment house;[129] and that in neither case does it appear that the distributees assumed responsibility for any other item of corporate indebtedness outstanding at distribution. Our conclusion that a taxpayer's basis for depreciation may properly include the unsatisfied balance of a debt secured by a mortgage or other lien on property at the time of his acquisition is unaffected by the difference in legal consequence between a lien indebtedness assumed and one not so assumed. The taxpayer in Crane,[130] we repeat, did not assume the mortgage on the apartment premises devised to her, and that, the Court held, did not alter the result.[131] The Court was "rather concerned with the reality that an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligations." [132] And as the Tax Court of the United States recently stated:

> The element of the lack of personal liability has little real significance due to common business practices. . . . [I]t is not at all unusual in current mortgage financing of income-producing properties to limit liability to the property involved. Taxpayers who are not personally liable for encumbrances on property should be allowed depreciation deductions affording competitive equality with taxpayers who are personally liable for encumbrances or taxpayers who own unencumbered property. The effect of such a policy is to give the taxpayer an advance credit for the amount of the mortgage. This appears to be reasonable since it can be assumed that a capital investment in the amount of the mortgage will eventually occur despite the absence of personal liability.[133]

By the same token, it is our view that distributees on complete liquidation of a corporation may also include in their depreciation bases their proportionate part of the corporation's unpaid insecured debts whether or not the distributees make themselves personally liable for those debts. In such situations, not essentially unlike those wherein distributed property is subject to lien indebtedness, creditors of the corporation have recourse to the distributed assets in the distributees' hands.[134] The economic burden on each distributee is thus much the same whether he assumes or simply accepts distribution subject to the corporate debts. That economic cost of acquisition is an investment in the

App.D.C. at 166–167, 313 F.2d at 557–558; District of Columbia v. Lewis, 109 U.S.App.D.C. 353, 356, 288 F.2d 137, 140 (1961). *Cf.* Verkouteren v. District of Columbia, *supra* note 2, 139 U.S.App.D.C. at 308–309 n. 29, 433 F.2d at 466–467 n. 29; *Oppenheimer II*, *supra* note 35, 124 U.S.App.D.C. at 224, 363 F.2d at 711; Berliner v. District of Columbia, *supra* note 53, 103 U.S.App.D.C. at 354–355, 258 F.2d at 654–655; Eastman Kodak Co. v. District of Columbia, 76 U.S.App. D.C. 339, 341, 131 F.2d 347, 349 (1942).

128. See notes 13, 38, *supra*, and accompanying text.

129. See note 25, *supra*, and accompanying text.

130. *Supra* note 118.

131. 331 U.S. at 13–14, 67 S.Ct. 1047.

132. *Id.* at 14, 67 S.Ct. at 1055.

133. Mayerson v. Commissioner, 47 T.C. 340, 351–352 (1966). There the taxpayers, on their purchase of business property, gave a large purchase money mortgage which imposed no personal liability on them and which, after two small initial payments on principal, called for no further principal payments for 99 years unless the taxpayers desired to make them. The court held that they could include in their depreciation base the debt which the mortgage secured. See also Blackstone Theatre Co. v. Commissioner, 12 T.C. 801, 804 (1949).

134. See text *supra* at notes 57–58.

acquired assets, and is a part of his depreciation base therefor.

We hold, then, that in each of the cases before us, the unsatisfied debts of the dissolved corporation at the time of liquidation properly enter the distributees' base for computing deductions for depreciation of their apartment house. The extent to which such debts may be taken into account for that purpose, however, is not the same in both. In *Pollin*, where the aggregated corporate indebtedness of $1,576,763.37 is considerably under the $1,630,848.12 at which the apartment house was valued on the corporate books net of depreciation,[135] the entire indebtedness may appropriately be added to the distributees' other costs of acquiring that property.[136] In *Lenkin*, however, the dissolved corporation's debts of $808,751.83 on liquidation greatly exceeded the $621,868.09 at which its apartment building and equipment were valued on its books.[137] To permit inclusion of the whole corporate indebtedness in the distributees' depreciation base would grant a step-up of the very kind *Oppenheimer II*[138] condemns. The *Lenkin* petitioners, then, must be limited to the $621,269.04 which the dissolved corporation had not itself already recovered through depreciation deductions.[139]

In No. 21,573, the *Lenkin* case, we reverse the decision of the Tax Court and remand the case to the Superior Court of the District of Columbia[140] for revision of petitioners' depreciation base to a figure of $543,675.98[141] and adjustment of the deficiency assessments accordingly. In No. 21,755, the *Pollin* case, we reverse the judgment of the District Court and remand the case to that court with instructions to revise appellants' depreciation basis to a figure of $1,630,848.12[142] and enter a judgment in their favor calculated thereon.

So ordered.

135. See text *supra* at notes 21–23.

136. Although in this case and perhaps in others the distributees' depreciation basis exactly equalled the corporate book value of the property net of depreciation, we do not mean to imply that stockholder-distributes acquired the corporation's basis. As in Verkouteren v. District of Columbia, *supra* note 2, 139 U.S.App.D.C. at 308, 433 F.2d at 466, we observed,

> [A corporation is] not the alter ego of its shareholding community, but a tax entity distinct from its stockholders. Assets demand independent tax treatment—perhaps differing treatment—according to whether they belong to the corporation, ongoing or dissolved, or to its stockholders.

We spoke there of basis for determining gain or loss on sale or other disposition of a capital asset prior to the District of Columbia Revenue Act of 1969. See note 7, *supra*. No reason has been suggested to us, nor do we perceive any, that persuades us that the situation is legally different where the basis for computing depreciation deductions for a new owner is the subject under investigation.

137. See text *supra* at notes 9–13.

138. *Supra* note 35, discussed in text *supra* at notes 101–105.

139. See discussion in text *supra* at notes 101–105.

140. See note 18, *supra*.

141. This is predicated upon the computation of depreciation base following. Petitioner's capital stock investment of $1,500 is added to the corporate liabilities, consisting in accounts and expenses payable of $12,803.07 and the mortgage balance to the extent of $621,868.09, see text *supra* at note 10, so limited for the reasons discussed in text *supra* at notes 137–39. These items total $636,171.16. From that figure are subtracted the value of other assets petitioners received on liquidation, consisting in current corporate assets of $87,556.26 and the benefit of prepaid taxes in the amount of $4,938.92, see note 9, *supra*. That establishes petitioner's depreciation base at $543,675.98.

142. Our computation of the depreciation base coincides with appellants'. See note 27, *supra*.