# Statutory Authority for Commodity Credit Corporation Export Credit Guarantee Programs

Certain programs of the Commodity Credit Corporation, guaranteeing export credit sales of American agricultural exports, are authorized by the Corporation's charter act

March 26, 1982

## MEMORANDUM FOR THE GENERAL COUNSEL, DEPARTMENT OF AGRICULTURE

This memorandum responds to your request for our opinion regarding the statutory authority for the Commodity Credit Corporation's (CCC) Noncommercial Risk Assurance Program (GSM–101) and Export Credit Guarantee Program (GSM–102).[1] The question of statutory authority has arisen in the course of a determination by your Office whether guarantees issued pursuant to these programs are supported by the full faith and credit of the United States.[2] We find ample, clear statutory authority for these export guarantee programs. Your determination regarding full faith and credit may properly rely on this finding.

---

[1] The Department of Agriculture's regulations governing these two programs appear at 7 C.F R §§ 1487–1487 15 and 7 C.F R §§ 1493–1493.15 (1981), respectively.

[2] Since 1973, it has been the policy of the Department of Justice to decline to issue formal opinions as to "full faith and credit" matters unless there is drawn into question a serious issue of law See Elliot L Richardson, Attorney General, Memorandum for Heads of the Executive Departments and Counsel to the President (Oct 10, 1973) It has long been the position of the Attorney General, however, that:

> [T]here is no order of solemnity of valid general obligations of the United States and    . no legal priority is afforded general obligations contracted pursuant to an express pledge of faith or credit over those not so accompanied. It is enough to create an obligation of the United States if an agency or officer is validly authorized to incur such an obligation on its behalf and validly exercises that power

41 Op Att'y Gen. 403, 405 (1959). See also 42 Op Att'y Gen 417 (1969); 42 Op Att'y Gen. 341, 344 (1967); 42 Op. Att'y Gen. 323 (1966); 42 Op. Att'y Gen. 305, 308 (1965), 42 Op. Att'y Gen. 21, 23–4 (1961). See generally Perry v. United States, 294 U S 330, 353–54 (1935); Lynch v United States, 292 U.S. 571, 580 (1934)

In an opinion holding that the Small Business Administration had authority to guarantee the sale of certain debentures owned by it, the Attorney General stated.

> [T]he threshold question concerning the effect of the proposed SBA guaranties is not whether the statutory language expressly alludes to the "faith" or "credit" of the United States, but whether the statutory scheme authorizes the guaranties here proposed If there is statutory authority for the guaranties, absent specific language to the contrary such guaranties would constitute obligations of the United States as fully backed by its faith and credit as would be the case were those terms actually used

Letter from John N Mitchell, Attorney General, to Thomas S. Kleppe, Administrator, Small Business Administration, at 3–4 (Apr 14, 1971) Similarly, in this case, a guarantee by the CCC will be backed by the full faith and credit of the United States if, and only if, the guarantee was issued pursuant to statutory authority.

The purpose of the GSM–101 and GSM–102 programs is to promote United States exports of agricultural commodities and products by shifting some of the risks usually associated with export transactions from the American exporter to the CCC. These risks, which include embargoes on imports, freezing of foreign exchange, and similar acts of state, as well as revolutions, wars, economic collapse, and other noncommercial incidents, all operate as a barrier to United States agricultural exports.

The GSM–101 and GSM–102 programs are similar in structure and operation. Both programs seek to encourage U.S. agricultural exports at levels above those which would exist without the guarantees.[4] Under the programs, CCC promises to reimburse the exporter, or the financing institution that is the exporter's assignee, for a portion of the exporter's accounts receivable in the event of nonpayment by the importer's bank that issued the irrevocable letter of credit pertaining to the export sale. In return, the exporter or assignee must assign to CCC all rights in the defaulted payment.[5] The total amount that CCC will guarantee, and the portion of the accounts receivable for which CCC will reimburse the exporter or assignee, is determined by CCC in advance for each country. Typically, the Corporation guarantees 98 percent of the principal amount and 8 percent per annum interest.

## II. Statutory Authority for the Programs[6]

15 U.S.C. § 714b[7] sets out the general powers of the CCC. These include the power to "determine the character of and the necessity for its obligations and expenditures and the manner in which they shall be incurred, allowed, and paid."

---

[3] The following description of these programs is based on discussions with members of your Office, and upon a memorandum attached to your letter to me dated November 20, 1981.

[4] The major difference between the two programs is that GSM–101 is limited to protecting only against noncommercial risks, while GSM–102 covers all risks. *Compare* 7 C.F.R. §§ 1487.2(k) *and* 1487.4(a), *with* 7 C.F.R. § 1493.4(a). Under the GSM–102 program, CCC relieves exporters or assignees of commercial risks which may be difficult for the exporter or assignee to assess because of lack of familiarity with foreign legal systems or banking practices, or a lack of adequate information. CCC now relies exclusively on the GSM–102 program and has ceased issuing new GSM–101 risk assurance agreements.

[5] *See* 7 C.F.R. §§ 1487.2–4; 1487.9(d); 1493.2; 1493.4; 1493.8(b)(3)(iv).

[6] A question related to this one was previously addressed in a letter and memorandum from this Office to Claude Coffman, Deputy General Counsel, Department of Agriculture (Dec. 3, 1973). In that correspondence, Leon Ulman, Deputy Assistant Attorney General, expressed doubt regarding CCC's authority to sell "time drafts" which it intended to draw against certain bank obligations it possessed. The bank obligations were obtained under a CCC export credit sales program. Mr. Ulman stated that "although we want to cooperate, we are not yet persuaded that CCC has the requisite authority [to sell its drafts]." The memorandum emphasized that CCC lacked specific statutory authority to sell securities or assets, and opined that the "necessary and appropriate" powers clause found in its charter may not be used as authority to sell securities and pledge the full faith and credit of the United States. *Cf.* 15 U.S.C. § 714b(m).

The present question relates to programs materially different from the Agriculture Department's proposal in 1973 to sell "time drafts." The most decisive difference is that the programs at issue in the current matter do not involve any sale of assets owned by CCC, or any guarantees for such sale. There is, in other words, no issue regarding authority to sell government obligations backed by the full faith and credit of the Nation. Rather, the question here concerns CCC authority to guarantee export credit sales of American agricultural exports.

[7] It has been held that § 714b—among other grants of authority to the CCC—must be broadly interpreted. *See Hiatt Grain & Feed, Inc. v. Bergland,* 446 F. Supp. 457, 472–73 (D. Kan. 1978), *aff'd,* 602 F.2d 929 (10th Cir. 1979), *cert. denied,* 444 U.S. 1073 (1980).

15 U.S.C. § 714b(j). In addition, the CCC is vested with "such powers as may be necessary or appropriate for the exercise of the powers specifically vested in the Corporation, and all such incidental powers as are customary in corporations generally[.]" 15 U.S.C. § 714b(m). Finally, 15 U.S.C. § 714c provides:

> the Corporation is authorized to use its general powers only to—
>
> \*        \*        \*        \*        \*
>
> (f) Export or cause to be exported, or aid in the development of foreign markets for, agricultural commodities.

Commenting upon § 714c, the Senate Report on the CCC charter act states:

> It is believed that there should be available to American agriculture an agency with the flexible authority vested in the Corporation by this section. . . .
>
> \*        \*        \*        \*        \*
>
> Subsection (f) authorizes the Corporation to export or cause to be exported, or aid in the development of foreign markets for, agricultural commodities. It is essential to the agricultural economy of the United States that it maintain and expand its markets abroad for agricultural commodities. This subsection empowers the Corporation to carry out operations to this end

S. Rep. No. 1022, 80th Cong., 2d Sess. 12–13, *reprinted in* 1948 U.S. Code Cong. Serv. 2138, 2151.

The Department of Agriculture interprets these statutes as providing sound authority for the GSM–101 and GSM–102 programs. *See* 43 Fed. Reg. 4033 (1978); 45 Fed. Reg. 64898 (1980). An agency's interpretation of a statute it is charged with implementing is entitled to substantial deference. *See generally Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381 (1969); *Udall v. Tallman,* 380 U.S. 1, 16 (1965); *Lenkin v. District of Columbia,* 461 F.2d 1215, 1227 (D.C. Cir. 1972).

Regardless of any deference due the Agriculture Department's interpretation, there is no doubt that the GSM–101 and GSM–102 programs are a valid exercise of the CCC's general power to "determine the character of and the necessity for its obligations . . . and the manner in which they shall be incurred[.]" 15 U.S.C. § 714b(j). That general power has been exercised in this instance for the purpose of promoting exports of United States agricultural commodities. *See* 7 C.F.R. §§ 1487.1(a), 1493.1(a). This purpose is explicitly authorized by 15 U.S.C. § 714c(f). We therefore find support for these programs in the plain meaning of these provisions. Furthermore, the broad language of the CCC charter act and its legislative history both indicate that a variety of programs may—indeed should—be developed by the CCC to assist in promoting American agricultural exports. GSM–101 and GSM–102 are just such programs, and therefore are within the ambit of authority provided the CCC in § 714.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

235